Johnny Luke was indicted for and convicted of the capital murder of James T. Hughes, the proprietor of a general store in Hurtsboro, Alabama, during a robbery in the first degree, or an attempt thereof, in violation of § 13A-5-40 (a)(2), Code of Alabama 1975.
Pursuant to § 13A-5-44, the appellant, with the consent of the State and with the approval of the trial court, waived the participation of a jury in the sentencing phase of the trial. We have examined the record setting out appellant's waiver of jury participation and we find that appellant was expressly informed of his right to have the jury involved in the sentence proceeding and that the appellant freely and intelligently gave up that right.
Thereafter, the trial court ordered a presentence investigation report as specified in § 13A-5-47 (b) and, with the consent of both parties, delayed the sentence hearing pending receipt of the report. Alabama Code § 13A-5-45 (a) (1975). Subsequently, the trial court weighed the aggravating and mitigating circumstances according to § 13A-5-47, and sentenced appellant to death. The court entered specific written findings regarding the existence or non-existence of each aggravating circumstance listed in § 13A-5-49, and each mitigating circumstance enumerated in § 13A-5-51 or referred to in § 13A-5-32.[1]
According to the mandate of § 13A-5-47 (d), the trial court made the following findings of fact summarizing the crime and the appellant's participation in this offense, which we hereby adopt: (R. 477-480).
 "At approximately 7:00 A.M., Central Daylight Time, on Friday, July 23, 1982, defendant was awakened by George Warren. Warren wanted defendant to help him load watermelons onto his El Camino pickup truck. They went to the house of Alice Starke, Warren's girlfriend, and loaded watermelons until 8:30 A.M. They then went to the house of Lucile Goode and they left several watermelons. Thereafter they went to the trailer of Warren in rural Russell County. At approximately 12:30 P.M. on that same day, Warren and defendant decided to rob the store of James T. Hughes in Hurtsboro, Russell County, Alabama. They traveled to the store in Warren's pickup and arrived there at approximately 1:30 P.M. Warren went inside first and purchased two cans of beer. By that time defendant had entered the store armed with a five-shot .38 caliber revolver. This weapon belonged to Warren and had been in defendant's possession for approximately a week. James T. Hughes was behind the counter upon which a cash register was placed. After Hughes made change for Warren's purchase, defendant fired the pistol four times. All four bullets struck Mr. Hughes. He was struck in the face, the upper left arm, the right forearm, and the upper right chest. This last bullet traveled through his body, severing the vena cava to the heart and caused substantial damage to the liver. After being discovered, he was transferred to Cobb Memorial Hospital in Phenix City, Alabama, where he died in surgery. Two bullets were recovered from the body of Mr. Hughes. These bullets were fired from the pistol which was later found in the trailer of George Warren. The death of Mr. Hughes was caused by a gunshot wound to his chest. Mr. Hughes was first discovered by Jimmy Lee Berry, who summoned aid. Mr. John T. Smith was one of the persons giving assistance to Mr. Hughes. Mr. Hughes said several times, `John T., I'm *Page 395 
not going to make it.' Hurtsboro Police Chief Richard Roynon asked Mr. Hughes who shot him. Mr. Hughes responded by saying, `That Luke boy and George Warren was with him.'
 "After the shooting Warren and defendant left the premises. Warren drove the pickup truck to his residence. While enroute defendant removed four spent shells and threw them out the window. Warren went inside his trailer with the pistol and left it there. This pistol was later recovered pursuant to a valid search warrant.
 "From Warren's trailer they drove to the house of Alice Starke and borrowed her car. The pickup truck was left in the yard. The defendant and George Warren went to the grocery store of Frank Hendricks in Hurtsboro, Alabama, where Warren bought several items. On the way back to Warren's residence they were apprehended by deputies of the Russell County Sheriff's Department. At that time defendant made a voluntary statement, after waiving his rights under the constitutions of the United States and Alabama. Defendant told Deputy Sheriff B.J. Ammons that Warren and he had decided that morning to go to the store of Mr. Hughes and rob him. He said they went to the store and Hughes `gave them trouble.' Defendant said he shot Hughes four times. Later that evening, at 5:00 P.M., at the Hurtsboro police department, the defendant said in a voluntary statement, after waiving his constitutional rights, that he and Warren went to Hughes' store. Defendant shot Hughes four times. Defendant also stated that he did not intend to rob Mr. Hughes. At 11:04 P.M. that same night, defendant made another voluntary statement, after waiving his constitutional rights. Defendant said he and Warren decided about 12:30 P.M. to rob Mr. Hughes' store because Hughes `had money there.' Defendant said that after Warren purchased some beer he (defendant) started shooting. Defendant said he was going to get money after he shot Hughes but that he didn't because he `changed his mind.'
 "On July 25, 1982, in another voluntary statement after waiving his constitutional rights, defendant said he shot Mr. Hughes. This statement was tape-recorded. Investigator Thomas Boswell testified at trial that after the voluntary waiver of constitutional rights and before the statement was recorded, defendant was asked if robbery was the motive. Investigator Boswell testified that defendant responded in the affirmative.
 "James T. Hughes was not armed with any weapon. There is no evidence to indicate that the killing of James T. Hughes by defendant was a justifiable or excusable homicide. The Court finds that defendant went to the store of James T. Hughes to rob him. There defendant intentionally shot and murdered James T. Hughes during an attempt to rob the said James T. Hughes."
 I
The appellant insists that, because there was no direct evidence of a theft of property from the victim, the State failed to prove that the murder was committed during a robbery or an attempted robbery.
The appellant's argument focuses on the third element of common-law robbery, "taking and carrying away of the personal property of another," see Davis v. State, 401 So.2d 187, 189
(Ala.Cr.App.), cert. denied, 401 So.2d 190 (Ala. 1981), concluding that without evidence of "taking," the appellant cannot be guilty of the crime charged.
This argument overlooks the fact that the present Alabama robbery statutes are broader than common-law robbery and embrace acts which, under former law, would have amounted to attempted robbery or to assault with intent to rob. Alabama Code §§ 13A-8-40 through -44 (1975) (Commentary); Marvin v.State, 407 So.2d 576 (Ala.Cr.App. 1981). Furthermore, the capital offense is "murder by the defendant during a robbery in the first degree or an attempt thereof committed by the *Page 396 
defendant." Alabama Code § 13A-5-40 (a)(2) (1975). Emphasis added.
Therefore, in our judgment, the jury was warranted in finding that appellant shot Hughes "in the course of committing a theft" as the indictment herein charged and as the robbery statutes of this state prohibit.
 "`IN THE COURSE OF COMMITING A THEFT' embraces acts which occur in an attempt to commit or the commission of theft, or in immediate flight after the attempt or commission."
Alabama Code §§ 13A-8-40 (b) (1975). "Attempt" is defined in §13A-4-2 (a), Code of Alabama 1975, as follows.
 "A person is guilty of an attempt to commit a crime if, with the intent to commit a specific offense, he does any overt act towards the commission of such offense."
The appellant's intent to rob is indicated by his own statements. As this court observed in Watters v. State,369 So.2d 1262, 1271-72 (Ala.Cr.App. 1978), reversed on other grounds, 369 So.2d 1272 (Ala. 1979):
 "[I]nconclusive facts and circumstances tending prima facie to show the corpus delicti may be aided by the admissions or confession of the accused so as to satisfy the jury beyond a reasonable doubt, and so to support a conviction, although such facts and circumstances, standing alone, would not thus satisfy the jury of the existence of the corpus delicti."
Although appellant also made other statements denying his intent to rob, we must view the evidence in the light most favorable to the State, Cumbo v. State, 368 So.2d 871, 874
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979), to determine "whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt," Dolvin v. State, 391 So.2d 133, 137 (Ala. 1980).
Thus, not only was the jury warranted in finding appellant's intent to rob from his own statements, but from the facts, they were also authorized to conclude that appellant's entering the store, drawing the pistol, and shooting Hughes were overt acts toward the commission of a robbery. The verdict of the jury and the written findings of fact by the trial judge that the capital offense occurred during an attempted robbery were amply supported by the evidence in this cause.
 II
The appellant asserts that the jury was unduly affected by the weeping of the victim's widow during the trial, thereby causing the sentence of death to be "imposed under the influence of passion and prejudice," in violation of § 13A-5-53
(b)(1).
The record does not indicate that the jurors were distracted, disturbed or influenced in any manner by the presence of Mrs. Hughes. Further, the record reveals that prior to appellant's objection concerning the widow's display of emotion, the trial court cautioned the jury "not to permit any sympathy, any prejudice, or any emotion for or against anyone to influence you." (R. 31).
More importantly, any influence on the jury could not have tainted the determination of appellant's sentence, since the jury was not involved in the sentencing phase of this trial. Following the appellant's waiver of jury participation, the trial judge alone determined all matters relating to this appellant's sentence.
 III
It is hereby noted that the death penalty is not cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments to the Constitution of the United States. Gregg v.Georgia, 428 U.S. 153, 168-88, 226, 96 S.Ct. 2909, 2922-32,2949, 49 L.Ed.2d 859 (1976); Beck v. State, 396 So.2d 645, 655
(Ala. 1980).
 IV
Under § 13A-5-53, Code of Alabama, this court is required, in addition to examining the record for errors affecting appellant's conviction, to review the propriety of the death sentence. *Page 397 
In accord with our statutory mandate, we have reviewed the sentencing phase of the trial and have found no error adversely affecting the appellant's rights. The trial court's findings concerning the aggravating and mitigating circumstances are fully supported by the evidence and, in our judgment, the sentence of death is proper in this case.
As shown by Appendix A, the trial court found one aggravating circumstance to exist and one mitigating circumstance to be present. The existence of the aggravating circumstance outline in § 13A-5-49 (4) (The capital offense was committed while the defendant was engaged in an attempt to commit robbery) is fully borne out by the evidence presented. The presence of the mitigating circumstance set out in § 13A-5-51 (1) (The defendant has no significant history of prior criminal activity) is also supported by the evidence. Further, the record reveals the trial court's assessment to be correct, that no aggravating or mitigating circumstances, other than those specifically found to be present, existed.
We have also determined, in accord with § 13A-5-53 (b) and (c) that
(1) the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor;
(2) that our independent weighing of the aggravating and mitigating circumstances at the appellate level reveals the death penalty is the proper sentence under the evidence; and
(3) that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and this defendant-appellant. See Beck v. State, 396 So.2d 645, 654 n. 5 (Ala. 1980) (the great majority of death sentences in Alabama are for robbery-murder).
In addition to addressing all of the questions raised by this appellant on this appeal, we have carefully searched the entire record for plain error, A.R.A.P. 45A, and have found none adversely affecting appellant's substantial rights. The judgment of conviction and sentence of death is due to be and is hereby affirmed.
AFFIRMED.
All the Judges concur.
[1] The trial court's findings of fact and sentence are incorporated herein as Appendix A. (R. 477-483).
 APPENDIX A
STATE OF ALABAMA,) IN THE CIRCUIT COURT OF )
Plaintiff ) RUSSELL COUNTY, ALABAMA )
vs. ) CRIMINAL ACTION NO. CC 82-320 )
JOHNNY LUKE, ) )
Defendant )
 DETERMINATION OF SENTENCE BY THE COURT
The defendant herein, with assistance of counsel at all proceedings, was found guilty as charged in the indictment. The Court heard the evidence at trial. Pursuant to Section13A-5-47, the Court makes the following findings of fact summarizing the crime herein and the defendant's participation in it:
 FINDINGS OF FACT FROM THE GUILT PHASE
At approximately 7:00 A.M., Central Daylight Time, on Friday, July 23, 1982, defendant was awakened by George Warren. Warren wanted defendant to help him load watermelons onto his El Camino pickup truck. They went to the house of Alice Starke, Warren's girlfriend, and loaded watermelons until 8:30 A.M. They then went to the house of Lucille Goode and they left several watermelons. Thereafter they went to the trailer of Warren in rural Russell County. At approximately 12:30 P.M. on that same day, Warren and defendant decided to rob the store of James T. Hughes in Hurtsboro, Russell County, Alabama. They traveled to the store in Warren's pickup and arrived there at approximately 1:30 P.M. Warren went inside first and purchased two cans of beer. By that time defendant had entered the store armed with a five-shot .38 caliber revolver. This weapon belonged to Warren and had been in defendant's possession for approximately a week. James T. Hughes was behind the counter upon which a cash register *Page 398 
was placed. After Hughes made change for Warren's purchase, defendant fired the pistol four times. All four bullets struck Mr. Hughes. He was struck in the face, the upper left arm, the right forearm, and the upper right chest. This last bullet traveled through his body, severing the vena cave to the heart and caused substantial damage to the liver. After being discovered, he was transported to Cobb Memorial Hospital in Phenix City, Alabama, where he died in surgery. Two bullets were recovered from the body of Mr. Hughes. These bullets were fired from the pistol which was later found in the trailer of George Warren. The death of Mr. Hughes was caused by a gunshot wound to his chest. Mr. Hughes was first discovered by Jimmy Lee Berry, who summoned aid. Mr. John T. Smith was one of the persons giving assistance to Mr. Hughes. Mr. Hughes said several times, "John T., I'm not going to make it." Hurtsboro Police Chief Richard Roynon asked Mr. Hughes who shot him. Mr. Hughes responded by saying, "That Luke boy and George Warren was with him."
After the shooting Warren and defendant left the premises. Warren drove the pickup truck to his residence. While enroute defendant removed four spent shells and threw them out the window. Warren went inside his trailer with the pistol and left it there. This pistol was later recovered pursuant to a valid search warrant.
From Warren's trailer they drove to the house of Alice Starke and borrowed her car. The pickup truck was left in the yard. The defendant and George Warren went to the grocery store of Frank Hendricks in Hurtsboro, Alabama, where Warren bought several items. On the way back to Warren's residence they were apprehended by deputies of the Russell County Sheriff's Department. At that time defendant made a voluntary statement, after waiving his rights under the constitutions of the United States and Alabama. Defendant told Deputy Sheriff B.J. Ammons that Warren and he had decided that morning to go to the store of Mr. Hughes and rob him. He said they went to the store and Hughes "gave them trouble." Defendant said he shot Hughes four times. Later that evening, at 5:00 P.M., at the Hurtsboro police department, the defendant said in a voluntary statement, after waiving his constitutional rights, that he and Warren went to Hughes' store. Defendant shot Hughes four times. Defendant also stated that he did not intend to rob Mr. Hughes. At 11:04 P.M. that same night, defendant made another voluntary statement, after waiving his constitutional rights. Defendant said he and Warren decided about 12:30 P.M. to rob Mr. Hughes' store because Hughes "had money there." Defendant said that after Warren purchased some beer he (defendant) started shooting. Defendant said he was going to get money after he shot Hughes but that he didn't because he "changed his mind."
On July 25, 1982, in another voluntary statement after waiving his constitutional rights, defendant said he shot Mr. Hughes. This statement was tape-recorded. Investigator Thomas Boswell testified at trial that after the voluntary waiver of constitutional rights and before the statement was recorded, defendant was asked if robbery was the motive. Investigator Boswell testified that defendant responded in the affirmative.
James T. Hughes was not armed with any weapon. There is no evidence to indicate that the killing of James T. Hughes by defendant was a justifiable or excusable homicide. The Court finds that defendant went to the store of James T. Hughes to rob him. There defendant intentionally shot and murdered James T. Hughes during an attempt to rob the said James T. Hughes.
After the trial both the State of Alabama and the defendant waived the participation of a jury in the sentence hearing. The Court finds that the defendant was expressly informed of his right to have the jury participate in the sentence hearing. The Court further finds that the defendant fully, voluntarily, knowingly, and intelligently *Page 399 
waived his right to the participation of a jury in this sentence hearing.
Subsequently the Court held a sentence hearing without the participation of a jury. At the sentence hearing the State rested on the evidence adduced at trial. At this hearing the defendant took the stand and testified that he did not intend to rob Mr. Hughes or take anything out of the store. He further testified that he was sorry about what happened at the store. He further expressed his desire to live. The Court then received arguments from the counsel for both parties.
The Court also ordered the probation officer for this circuit to prepare a written presentence investigation report. This report was duly prepared and filed with the Court. Copies of the same were furnished to counsel for both parties. A hearing was held for the parties to respond to the report and to present evidence about any part of the report which would be the subject of a factual dispute. At this hearing the State presented no further evidence. The defendant, through his counsel, rested upon the matters brought forth at the sentence hearing.
The Court finds from the evidence presented in this case that the defendant was guilty and is guilty of the murder of James T. Hughes while committing a robbery in the first degree.
 FINDINGS FROM THE SENTENCE PHASE
The Court finds the following aggravating circumstance to exist in this case:
The capital offense was committed while the defendant was engaged in the commission of an attempt to commit robbery.
The Court finds that the following aggravating circumstances do not exist in this case:
a. the capital offense was committed by a person under sentence of imprisonment.
b. the defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person.
c. the defendant knowingly created a great risk of death to many persons.
d. the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
e. the capital offense was committed for pecuniary gain.
f. the capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
g. the capital offense was especially heinous, atrocious or cruel compared to other capital offenses.
Upon consideration of all the evidence brought forth at the trial in this case, the sentence hearing, and the presentence investigation report, the Court finds that the following mitigating circumstance exists in this case:
The defendant has no significant history of prior criminal activity.
The Court finds that the following mitigating circumstances do not exist in this case:
a. the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
b. the victim was a participant in the defendant's conduct or consented to it.
c. the defendant was an accomplice in the felony offense committed by another person and his participation was relatively minor.
d. the defendant acted under extreme duress or under the substantial domination of another person.
e. the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
f. the age of the defendant at the time of the crime.
g. any other circumstances offered pursuant to Section13A-5-52. *Page 400 
Upon considering and weighing the aggravating circumstance with the mitigating circumstances in this case, the Court is of the opinion that the aggravating circumstance outweighs any mitigating circumstances. It is, therefore,
ORDERED AND ADJUDGED BY THE COURT that the defendant be sentenced to death by electrocution as specified in the laws of this state and as set forth in an order of sentence by this Court.
DONE this the 29th day of October, 1982.
 /s/ Wayne T. Johnson
Circuit Judge