[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 222 
The appellant, Thomas Edward Powell, was convicted after a jury trial of robbery in the first degree, in violation of § 13A-8-41, Code of Alabama 1975. He was sentenced as a habitual offender to life in prison without the possibility of parole. On appeal, he raises nine issues. Because two of these issues are related, we address eight issues in this opinion.
A brief rendition of the facts of this case is necessary for a complete understanding of the issues raised by the appellant. At trial, the evidence tended to show the following facts: On February 24, 1992, at approximately 7:15 p.m., the victim, Katherine Griffin had entered her automobile and was putting on her seat belt when a man she identified in court as the appellant opened the driver's side door to her car door and ordered her to move to the passenger seat. The appellant was wearing glasses and a blue shirt with a gold number "20" on it. He was armed with a knife. The appellant pushed Griffin into the passenger seat, entered the car, and closed the driver's side door. As the appellant attempted to start the car, the victim began to kick the appellant, managed to sound the car horn by using her foot, and began to scream. The appellant moved toward the victim with the knife, but the victim took it away from him. A struggle ensued in which the victim was injured.
Neighbors, Phillip Gingras, Debra and Larry Horne, and "Sissy" Holifield, heard the commotion. Gingras ran to assist the victim. He pulled the appellant from the car and put him in a "headlock." Debra Horne, who had also run to assist the victim, observed Gingras struggling with the appellant. The appellant got away from Gingras and fled into the nearby woods. He was arrested shortly thereafter.
 I
The appellant makes three contentions regarding his sentence of life without the possibility of parole.
 A.
The appellant argues that the trial court improperly used a conviction for leaving the scene of an accident, a violation of § 32-10-1, Code of Alabama 1975, to enhance his sentence because, he says, that conviction did not occur under Title 13A of the Code of Alabama. This argument, however, is without merit.
State's exhibit no. 2 is the case action summary and certified judgment entry for the appellant's conviction for leaving the scene of an accident. The judgment entry reveals that the appellant was sentenced to five years' imprisonment for that conviction.[1] *Page 223 
Section 13A-5-9, the Habitual Felony Offender Act, provides that its enhancement provisions apply "[i]n all cases when it is shown that a criminal defendant has been previously convicted of any felony and after such conviction has committed another felony." (Emphasis added.) The words "any felony" have been construed to mean that "all felonies come within the purview of the habitual felony offender statute, regardless of their origin," Watson v. State, 392 So.2d 1274, 1279
(Ala.Cr.App. 1980), cert. denied, 392 So.2d 1280 (Ala. 1981). SeeTurner v. State, 610 So.2d 1198 (Ala.Cr.App. 1992). Alabama Rule of Criminal Procedure 26.6(b)(3)(iv) provides, in pertinent part: "Any conviction in any jurisdiction, including Alabama, shall be considered and determined to be a felony conviction if the conduct made the basis of that conviction constitutes a felony under . . . § 13A-1-2(4)." Section 13A-1-2(4) defines a felony as "[a]n offense for which a sentence to a term of imprisonment in excess of one year is authorized by this title."
In Gibson v. State, 555 So.2d 784 (Ala.Cr.App. 1989), this court held that the appellant could be sentenced as a habitual offender although one of his prior convictions was for a drug offense, which fell outside the scope of the criminal code. Seealso Justo v. State, 568 So.2d 312 (Ala.Cr.App. 1990) (trial court used a drug related felony to enhance sentence for rape and burglary conviction); Seritt v. State, 401 So.2d 248
(Ala.Cr.App.), cert. denied, 401 So.2d 251 (Ala. 1981) (trial court used prior felony drug offenses to enhance sentence for robbery conviction). Gibson, Justo, and Seritt are applicable to this case in that they stand for the proposition that felonies provided for outside Title 13A may be used to enhance sentences for felonies provided for by Title 13A. Thus, based on Gibson, Justo, and Seritt, and on the fact that the appellant received a sentence in excess of one year for his conviction for leaving the scene of an accident, the appellant's argument is without merit.
 B.
The appellant contends that because he had previously been treated as a habitual offender when he was sentenced for his third conviction and because he was still serving that sentence, he should not have been sentenced as a habitual offender for this conviction. He contends that because his prior convictions were in effect used twice, his sentence violates the double jeopardy clause. This contention is wholly without merit. See Johnson v. State, 398 So.2d 393
(Ala.Cr.App. 1981).
 C.
The appellant contends that "[t]he sentence in this case was disproportionate where [he] was 'drunk as a skunk' at the time and nothing was taken from [the victim] and where [the victim's] automobile was never started." This contention is without merit. First, a sentence of life imprisonment without the possibility of parole for a conviction for robbery in the first degree after having been previously convicted of three felonies is not "unduly harsh." Smith v. State, 529 So.2d 1022
(Ala.Cr.App. 1987). Furthermore, it is mandatory that a defendant who has been convicted of a Class A felony (such as robbery in the first degree) after having been convicted of three prior felonies be sentenced to life in prison without the possibility of parole. Holley v. State, 397 So.2d 211
(Ala.Cr.App.), cert. denied, 397 So.2d 217 (Ala. 1981).
 II
The appellant contends that the trial court erred by ruling that he had not proved a prima facie case of discrimination pursuant to Batson v. Kentucky, 476 U.S. 79, *Page 224 106 S.Ct. 1712, 90 L.Ed.2d 69 (1976). At trial, the appellant objected to the state's exercising two of its six (33%) peremptory challenges to remove two of the seven (29%) black veniremembers. The state, in turn, objected to the appellant's striking one black veniremember. The venire consisted of 28 members. After noting that there were four blacks on the jury, the trial court denied the appellant's Batson motion.
The appellant cites Huntley v. State, [Ms. 1910530, Sept. 19, 1992], 1992 WL 228152 (Ala. 1992), for the proposition that the trial court should have skipped the determination of whether the appellant had presented a prima facie case of discrimination and instead considered whether the state had exercised its strikes in a racially discriminatory manner because, he argues, there was "an inference of discrimination." However, the appellant misstates the main proposition ofHuntley. In Huntley, the Alabama Supreme Court cited with approval cases from this court[2] wherein this court ruled on the race neutrality of the strikes rather than on the threshold issue of whether the defendant had presented a prima facie case of discrimination where the prosecution had given the reasons for its strikes even though the trial court either explicitly found that a prima facie case had not been established, questioned whether one had been established, or did not even consider whether one had been established. Unlike the trial court in Huntley, the trial court in this case found that the appellant failed to establish a prima facie case, and it did not require the state to give reasons for its strikes. Thus, we need only review the trial court's determination that the appellant failed to establish a prima facie case of discrimination. In our review, we are guided by the Alabama Supreme Court's holding in Harrell v. State, 571 So.2d 1270,1271-72 (Ala. 1991), cert. denied, 499 U.S. 984, 111 S.Ct. 1641,113 L.Ed.2d 736 (1991), as follows:
 "As we explained in Harrell [v. State, 555 So.2d 263 (Ala. 1989)], a defendant cannot prove a prima facie case of discrimination solely from the fact that the prosecutor struck one or more blacks from his jury. A defendant must offer some evidence in addition to the striking of blacks that would raise an inference of discrimination. When the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created. Logically, if statistical evidence may be used to establish a prima facie case of discrimination by showing a discriminatory impact, Harrell, 555 So.2d [at] 267, citing United States v. David, 803 F.2d 1567, 1571 (11th Cir. 1986), then it should also be available to show the absence of a discriminatory purpose." (Emphasis in original.)
Because the appellant offered no evidence of discrimination other than the fact that the state struck two black veniremembers and because there was a greater percentage of blacks on the jury (33%) than on the venire (25%), the appellant's contention is without merit.
 III
The appellant argues that the state should have disclosed to the appellant evidence of the appellant's intoxication prior to trial, and that by not doing so, the state violated the principle of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963). During the testimony of Officer Todd Kyser, defense counsel elicited that in Kyser's opinion the appellant "had been drinking a lot" prior to his arrest. At the beginning of the proceedings the day after Kyser testified, counsel moved for a mistrial because he had not been furnished evidence of the appellant's intoxication in a police report. The appellant argues that the trial court should have granted his motion for a mistrial because the state failed to furnish the police report in which Officer K.C. Foxe noted that the appellant was intoxicated at the time of his arrest. He argues that this evidence was material because, he says, his intoxication, while not a complete defense to robbery in the first degree, would have negated *Page 225 
the specific intent required to convict him of robbery.
"To establish a Brady violation, the appellant must demonstrate that: (1) the prosecutor suppressed evidence, (2) the evidence was favorable to the appellant or was exculpatory, and (3) the evidence was material." Edwards v. State,574 So.2d 864, 868 (Ala.Cr.App. 1990). We conclude that the appellant was not aware of Foxe's conclusion of his intoxication until Kyser's testimony concerning his arrest report, as supplemented by Foxe, and that that evidence was favorable to the appellant because intoxication may negate an element of the offense with which the appellant was charged. However, we conclude that Foxe's conclusion would not have been material. " 'The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " McMillian v. State, 616 So.2d 933, 942 (Ala.Cr.App. 1993) (quoting United States v. Bagley, 473 U.S. 667, 682,105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)).
The appellant had a sufficient opportunity to develop a defense based on intoxication and did so, there is no "reasonable probability" that the result of the trial would have been different had he possessed Foxe's conclusion in the police report prior to trial. In fact, Foxe's notation was elicited during Kyser's testimony during the state's case-in-chief and Foxe was a defense witness on the issue of the appellant's intoxication. Moreover, several witnesses testified as to the appellant's intoxicated condition prior to the incident, and the trial court charged the jury on intoxication as a defense. The appellant had the opportunity to adequately develop a defense of intoxication and did so; therefore, even if the late disclosure of Foxe's opinion in the police report were error, it was harmless.
 IV
The appellant argues that the trial court erred by refusing to give his requested jury instructions regarding reckless assault. He contends that because he asserted at trial that he had been intoxicated and, therefore, that he did not have the specific intent to commit robbery, the trial court should have instructed the jury regarding reckless assault in the second degree as provided by § 13A-6-21(a)(3) and reckless assault in the third degree, as provided by 13A-6-22(a)(2), Code of Alabama 1975.
The appellant was charged by indictment with robbery in the first degree for "us[ing] force or threaten[ing] the imminent use of force against the person of Katherine Griffin, with the intent to overcome her physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with [her] property, while [he] was armed with a deadly weapon or dangerous instrument. . . ." He was not charged pursuant to § 13A-8-41(a)(2), which provides for robbery in the first degree in which the defendant allegedly caused "physical injury to another." The state merely had to prove that he used "force," rather than prove that the victim suffered "physical injury."
Neither reckless assault in the second degree as provided for by § 13A-6-21(a)(3) nor reckless assault in the third degree as provided for by § 13A-6-22(a)(2), is a lesser included offense of the robbery in the first degree alternative of §13A-8-41(a)(2), as the term "lesser include offense" is defined by § 13A-1-9 or by Ex parte Jordan, 486 So.2d 485 (Ala. 1986). Neither assault offense "is established by proof of the same or fewer than all the facts required to establish the commission of the offense charged. . . ." See § 13A-1-9(a)(1). Both §13A-6-21(a)(3) and § 13A-6-22(a)(2) require proof of some physical injury before one can be charged with assault, whereas § 13A-8-41(a)(2) requires only proof of force for one to be charged with robbery. Neither assault section "consists of an attempt or solicitation to commit [robbery in the first degree] or to commit a lesser included offense." See § 13A-1-9(a)(2). Nor is reckless assault in the second or third degree "specifically designated by statute as a lesser degree" of robbery in the first degree. See § 13A-1-9(a)(3). Finally, contrary to § 13A-1-9(a)(4), both code sections charging assault require greater injury than required to charge robbery rather than lesser *Page 226 
injury. Thus, because reckless assault as provided by §§13A-6-21(a)(3) and -22(a)(2) is not a lesser included offense of robbery in the first degree as charged in the indictment, the trial court did not err by refusing the appellant's requested jury instructions.
 V
The appellant argues that the photographic array used to identify him was impermissibly suggestive. He contends that because his photograph differed from others in the array and because "the [s]tate did not prove by clear and convincing evidence that the in-court identification had an independent source," the photographic array was improperly admitted, and he should be granted a new trial. This argument, however, is without merit.
The victim identified the appellant in court without objection and testified that she had identified him when he was brought to the hospital while she was being treated for her injuries. Nothing in the record suggests that the victim had ever seen the photographic array. Philip Gingras identified the appellant in court without objection. The record reveals that Gingras was shown the photographic array, but it does not indicate whether he identified the appellant in the array. Although Larry Horne did not identify the appellant in court, he described the man who had attacked the victim. The record reveals that Horne was shown the photographic array; however, the record does not reflect whether he ever identified the appellant in the array. Debra Horne, who identified the appellant in the photographic array, testified that she had chosen the appellant's photograph out of those in the array based on her observations at the scene of the attack rather than on anything that the police may have told her. Sissy Holifield did not identify the appellant at trial, but she described the man who had attacked the victim. Thus, Horne was the only witness who had identified the appellant in the array.
The appellant focuses on the facts that the other men pictured in the array are not wearing shirts similar to the one the appellant was alleged to have been wearing at the time of the offense, that some of them, unlike the assailant, had facial hair and that the length of hair of some was different from the assailant's hair length. The photographic array was shown to Horne on the night of the offense, but the record does not reflect when the photograph of the appellant included in the array was taken.
 "[W]hether eyewitness identification evidence which ensues from a pre-trial identification procedure is constitutionally infirm requires a two-step inquiry. First, it must be determined whether the pre-trial identification procedures were unduly suggestive. . . . If so, the suggestiveness of the identification procedures must be balanced against factors indicating that the in-court identification was independently reliable."
Hull v. State, 581 So.2d 1202, 1204 (Ala.Cr.App. 1990). The pictures in the array this case are not unduly suggestive. While some of the subjects in the photographs appear to be wearing different colored shirts[3] and some may have slight facial hair, they share the same general physical characteristics. Moreover, only one subject's hair length was different from the others. Furthermore, the police did not tell Horne anything about the array before she identified the appellant.
Even if the photographic array were suggestive, Debra Horne's identification of the appellant had a basis independent of the photographic array. See Mullis v. State, 545 So.2d 205, 209
(Ala.Cr.App. 1989) (when in-court identification has basis other than pretrial identification, then the in-court identification is properly admitted). Horne testified that her selection of the appellant's photograph was based on her observation of the appellant at the scene. Horne explained that while she was on the passenger side of the car trying to help the victim, the appellant was facing her, and that when Gingras pulled the appellant from the car, she "got a glimpse of [the appellant] again." She further testified that the individual was wearing glasses, had short, reddish-brown hair, and *Page 227 
was about 5' 11" tall, a description consistent with that given by other witnesses.
Thus, the appellant's argument is without merit.
 VI
The appellant argues that the trial court erred by refusing to suppress three separate statements he made to the police. He argues that the police obtained the statements from him in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
The appellant contends that his statement given at the Opelika Police Department was involuntary for the following reasons:
 "[It] was given only after he had been held for a period of time in the Opelika City Jail without being given the opportunity to make a phone call, without being able to discuss the matter with a lawyer and only after having been told that he would be prosecuted and [that] the prosecution would seek the maximum penalty afforded . . . life in prison without the possibility of parole.
(Footnote omitted.) He also contends that the statement he made while he was being transported from the jail to the courthouse and the statement he made at the courthouse, while both arguably initiated by him, were the products of the previous allegedly involuntary statement. He further contends that the facts that when he made the statements, he was 27 years old and had only an eighth-grade education were indicative of the involuntariness of his statement.
The trial court held a suppression hearing to determine whether the appellant's statements were voluntary. At the hearing, Captain Thomas P. Barnes of the Opelika Police Department testified that he and a Lieutenant Cooper, who was unavailable to testify, attempted to obtain a statement from the appellant while he was at the police station. The appellant told the officers that he could read and write. Barnes and Cooper had the appellant read aloud a waiver of rights form to ensure that he could read and then read the form to him. The record conflicts as to whether the appellant was given the opportunity to contact anyone by telephone at this point.[4]
However, Barnes testified that the appellant had not asked for an attorney at the time he gave his statement. Barnes testified that he may have mentioned to the appellant that if he were convicted, he would be sentenced to "life without parole," but he did not tell the appellant that in order to obtain a statement. He further stated that the appellant was neither threatened nor coerced into giving a statement. Barnes's rendition of the appellant's statement is as follows:
 "He stated that he had left the Red Eagle Honor Farm around noon. Him and a guy named James — James Ledbetter — got a car, said they drove to Opelika to see James's sister at the apartments in Opelika. Called James's other sister, and they stayed at her apartment for awhile. He said he couldn't remember her name. James and his sister and everybody that had been in the apartment, he told me, had left to go to the store and left him there. He said he went outside. All he was going to do was ask for a ride. He went to ask the lady for a ride and she 'freaked.' 'Freaked out' [were] his exact words."
Barnes testified that, after giving the statement, the appellant asked for an attorney, and the interview was terminated.
The trial court ordered the prosecutor to delete any reference to Red Eagle Honor Farm, to delete any reference about coming from Montgomery and to elicit only the fact *Page 228 
that the appellant arrived in an automobile, and not to tell the jury that the appellant asked for an attorney.
Detective James Murphy of the Opelika Police Department also testified during the suppression hearing, specifically about questions the appellant asked officers on his way from the Opelika city jail to the Lee County Justice Center and while he was at the Justice Center. Murphy testified that he and Lieutenant Cooper transported the appellant to a "probable cause" hearing. At this time, he knew that the appellant had requested an attorney and that one had not yet been appointed. On the way to the Justice Center, the appellant asked the officers what he had been charged with. Cooper told him that he was charged with robbery in the first degree and kidnapping in the first degree. The appellant then asked how he could be charged with those offenses when he had only attempted to commit those offenses. Murphy testified that neither he nor Cooper attempted to engage the appellant in conversation in any way.
Murphy further testified that while they were in a courtroom at the Justice Center, the appellant asked him, "Did y'all find any glasses?" Murphy responded as follows: "I don't know. What do your glasses look like?" The appellant described them as gold with "a wood type design on top." Murphy testified that the appellant voluntarily questioned him and that he did not attempt to engage the appellant in conversation in any way.
The appellant testified to the following for the limited purpose of the suppression hearing: He was taken upstairs from the jail for questioning by the Opelika police. He refused to give a statement and was returned to the jail. He was interviewed by detectives from Montgomery before he spoke with the officers from Opelika. Lieutenant Cooper told him that they were "going to prosecute life without with my priors." The appellant claimed that he did not remember making a statement, but that he remembered asking for an attorney. He also claimed that he did not remember signing the waiver of rights form, but he admitted that the signature on it was his. He also admitted asking questions of the officers while he was being transported to the Justice Center and asking at the Justice Center about his glasses. He further testified that on the night of his arrest, he was told by the Opelika police that they were "going to get me for life without parole."
On cross-examination, the appellant admitted that he had three prior felony convictions and that he was aware of his "rights." He did not remember officers reading hisMiranda rights to him or his asking questions on the way to the Justice Center. He further admitted that when he asked for an attorney during the interview at the city jail, the officers ceased questioning.
The vast majority of the testimony at the suppression hearing was conflicting. The appellant's testimony conflicts with that of Barnes and Murphy, and even with his own testimony. At one point, the appellant stated that he did not remember making a statement, and at another, he implied that he had made a statement because the police told him that in prosecuting him they were going to seek a sentence of life in prison without the possibility of parole. The trial court apparently based its ruling on its perception of the credibility of the witnesses at the suppression hearing. This court has held as follows:
 " 'Absent clear error, the [trial] court's credibility choices at suppression hearings are binding on this court.' Walker v. State, 551 So.2d 449, 451 (Ala.Cr.App. 1989). The standard of review of conflicting evidence at a [hearing on a] motion to suppress a confession is whether the trial court's finding was 'manifestly contrary to the great weight of the evidence.' Ex parte Matthews, 601 So.2d 52 (Ala. 1992), cert. denied, . . . [___ U.S. ___] 112 S.Ct. 2996 [120 L.Ed.2d 872] (1992). See also Ex parte Singleton, 465 So.2d 443, 445
(Ala. 1985) (whether the finding was 'palpably contrary to the weight of the evidence')."
Thompson v. State, 611 So.2d 476, 478 (Ala.Cr.App. 1992). Based on the foregoing, we conclude that statement made by the appellant at the Opelika police station was voluntary, see Exparte Bankhead, 585 So.2d 112 (Ala. 1991), and that the trial court's ruling *Page 229 
was not "manifestly contrary to the great weight of the evidence." The trial court could have reasonably concluded from the totality of the circumstances that the appellant had been given an opportunity to contact an attorney before making this statement, that the statement was not the result of any threat of the possibility of an unduly harsh sentence, and that when the appellant requested an attorney, all questioning ceased.
The appellant's specific contention with regard to the statements made on the way to and at the Justice Center is as follows:
 "[The statements were] a continuation of his involuntary statements made earlier in the sense that he had been in jail for two (2) days by this time, he had not been allowed to contact anyone, he had not been able to discuss his case with an attorney, he had been interviewed by detectives from Montgomery and he was still being told that he would be subjected to life in prison without the possibility of parole."
These latter two statements were indisputably volunteered and were not made as the result of any interrogation.
The appellant's question to the police officers asking what he was being charged with and his statement that he had only attempted the offenses with which he was charged were admissible as volunteered statements that were not excludable because of interrogation in violation of Miranda. In Edwards v.Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85,68 L.Ed.2d 378 (1981), the United States Supreme Court held as follows:
 "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police."
(Emphasis added.) See Watkins v. State, 495 So.2d 92
(Ala.Cr.App. 1986). Thus, because the appellant's question and statement made in transit to the Justice Center were volunteered, they were properly admitted by the trial court.
The appellant's question to Murphy while waiting for the hearing ("[d]id y'all find any glasses?") was also volunteered and was not excludable as a product of interrogation in violation of Miranda. See Edwards; Watkins. Murphy responded to the appellant's question as follows: "I don't know. What do your glasses look like?" Even if we concluded that Murphy's question constituted "interrogation," the appellant's reply ("[t]hey were a gold frame with a wood design on top") was admissible because he initiated the conversation; therefore, it was not excludable as a result of interrogation in violation ofMiranda. See Edwards; Watkins. The appellant's glasses, which were found in the victim's automobile, were admitted at trial through Murphy as state's exhibit no. 2. No other description of the glasses is contained in the record.
We conclude that these volunteered statements were admissible. To the extent that the appellant argues that they were the product of his prior allegedly involuntary statement, his argument is without merit because we concluded that his initial statement was voluntary and that the trial court's ruling was not "manifestly contrary to the great weight of the evidence."
 VII
The appellant argues that the trial court erred by denying his motion for a mistrial made during the prosecutor's closing argument. During the state's case-in-chief, David Colvin testified, without objection, that James Ledbetter, his brother-in-law, and the appellant had come to his apartment to see him and his wife. They went to a store in two cars. The Colvins returned to their apartment, and shortly thereafter, Ledbetter came back alone. The Colvins and Ledbetter left the apartment to visit Ledbetter's mother. When they returned to the apartment complex, they found that the front door to the Colvin's apartment had been "kicked in." The only item missing was a knife, which Colvin identified as state's exhibit no. *Page 230 
1, the knife recovered at the scene of the robbery. This testimony and the knife were admitted without objection; therefore, any contention based on the admission of this evidence is procedurally barred. Maul v. State, 531 So.2d 35
(Ala.Cr.App. 1987).
During the prosecutor's closing argument, the following occurred:
 "[Y]ou heard later on when the Hornes[5] left what happened then. The defendant wasn't with them. They were gone. What did the defendant do? He kicks in their front door. He breaks into their apartment —"
 "MR. MEADOWS [defense counsel]: Your Honor, we would object to misconduct not charged.
 "MR. MYERS [prosecutor]: It's part of the facts of the case. Breaks in the front door and what does he steal? He steals one thing —
"MR. MEADOWS: We would object —
 "MR. MYERS: He doesn't steal a whole bag full of goodies. He steals —
 "MR. MEADOWS: Excuse me. We would object to any connotation of misconduct not charged and move for a mistrial.
 "THE COURT: Motion for a mistrial is denied. Go ahead."
The evidence of the break in to which the prosecutor referred had not been objected to and was before the jury; therefore, his comments were legitimate inferences from the evidence. "A prosecutor may argue in closing any evidence that was presented at trial. He may also ' "present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way." ' " Williams v. State, [Ms. 89-633, March 27, 1992], 1992 WL 92491 (Ala.Cr.App. 1992) (quoting Williams v. State,601 So.2d 1062, 1072-73 (Ala.Cr.App. 1991) (quoting other sources)). It was logical for the prosecution to infer from the evidence that the appellant, who had been in that apartment earlier in the day, kicked in the door, took the knife, and used it to commit the robbery. Thus, the appellant's argument is without merit.
 VIII
The appellant, while conceding that "a taking" is not an element of robbery in the first degree, argues that it should be. He contends that we should revert to the common-law definition of robbery and re-establish the offense of attempted robbery. Prior to the enactment of article 2, Chapter 8 of Title 13A, there was no statutory robbery offense in Alabama.See Grace v. State, 431 So.2d 1331 (Ala.Cr.App. 1982). However, "the present Alabama robbery statutes are broader than common-law robbery and embrace acts which, under former law, would have amounted to attempted robbery or assault with intent to rob." Luke v. State, 444 So.2d 393, 395 (Ala.Cr.App.), aff'd, 444 So.2d 400 (1983), cert. denied, 466 U.S. 993,104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). It is clear that the legislature, by omitting the "taking" element, sought to punish robbery as a crime against the person and the property, rather than merely as a crime against the property. We have no authority to depart from the law as the legislature clearly intended.
Based on the foregoing, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] The appellant was convicted and sentenced before the effective date of the current version of § 32-10-6, the punishment provision for a violation of § 32-10-1. The former version of §32-10-6 provided for the following punishments:
"Every person convicted of violating sections 32-10-1 through32-10-5 or any of the provisions thereof shall be punished by a fine of not more than $5,000.00, or by imprisonment in the county or municipal jail or hard labor for the county for not less than 30 days nor more than one year, or by imprisonment in the penitentiary for not less than one nor more than five years, or by both such fine and hard labor or imprisonment."
The current version of § 32-10-6 classifies the violation as a Class A misdemeanor if only damage to property resulted from the violation, or as a Class C felony if physical injury or death resulted.
[2] McLeod v. State, 581 So.2d 1144 (Ala.Cr.App. 1990); Williams v.State, 548 So.2d 501 (Ala.Cr.App. 1988).
[3] We cannot be more conclusive because we have been provided with only black and white photographs.
[4] Barnes's conflicting testimony was as follows:
 "Q, [by defense counsel] He had been in your care, custody, and control since [the night before]. Had there been any — had he been given the opportunity to contact a lawyer or had any lawyer been appointed to represent him at that time?
 "A. He had been given the opportunity to contact a lawyer, but I don't — I don't reckon one had been appointed for him.
 "Q. Prior to this time had he been allowed to contact anyone outside of the jail?
"A. Not to my knowledge, he hadn't.
 "Q. So he had been in the jail since the night before and had not been allowed to contact anyone before this interview began on 2/25 at 10:42 a.m.?
"A. That's correct."
[5] The prosecutor misspoke when he said the "Hornes." It is clear from his argument that he was referring to the Colvins.