BASCHAB, Judge.
The State appeals from the trial court’s order suppressing evidence law enforcement officers seized during a search of the house of the appellee, Billy Gerald Darin Morgan. The appellee filed a pretrial motion to suppress in which he argued that the evidence law enforcement officers seized pursuant to a search of his house should be suppressed because the officers did not have a search warrant or consent to search his house when they initially entered his house; that, because the officers’ initial entry into his house was not lawful, they did not properly discover the items that were in plain view in his bedroom; and that his subsequent consent to search his house was not voluntary. After conducting a hearing, the trial court granted the appellee’s suppression motion. This appeal followed.
Lieutenant Chris Landers testified that he was an investigator with the Somerville Police Department; that, on August 7, 2003, he obtained an arrest warrant for William Gary Truss; that Truss’ parents’ residence was the address listed on the warrant; that Officer Clemmons went to Truss’ parents’ residence to serve the warrant; that Truss’ father said that Truss was living with Cherry Morgan in a trailer on Whitten Drive; that they went to that address to try to serve the warrant; that he and Clemmons parked between a trailer and a house; that the trailer was at the rear of the house, and there was “a little more than room enough to get the vehicles between the two”; that they went to the trailer because they had been told that Truss was staying in a trailer; that they walked around and looked inside of the trailer; that the trailer was vacant, no one was living in it, and there were not any *1086 blinds or curtains in it; that, when he and Clemmons walked around the trailer, he saw a boy in the yard; that he asked the boy if he knew Truss, and the boy said he did; that he then asked the boy “ ‘Can you tell me — does he live here or where is he at?’ ” and the boy said that Truss was in the house; that he asked the boy if he could get Truss, and the boy said he could; that they followed the boy to the side of the house; that, when they got to the side of the house, the boy stopped and looked at him; that he asked the boy if Truss was in the house, and the boy said he was; that he asked the boy to get Truss; that the boy then went through the garage or open carport and into a door that was open; that he and Clemmons walked up to the door; that the boy went down a long hallway and turned the corner; that he knocked at the door, but no one answered; that he heard someone asking the boy “ ‘Who is it?’ ” or “ “Who is at the door?’ ” and the boy said that it was the police; that he also said, “ ‘It is the police department,’ ” but no one came to the door; that, at that time, there was a lot of movement in the house, and he could hear scrambling and moving; that he could only see a hallway and did not have any idea about what was going on at that time; that they did not know if someone was getting a weapon or trying to leave the house; that he and Clemmons entered the house; that there were at least seven adults and several children in the house; that the people in the house were running around; that, when they entered the living room, he saw a window being knocked out of a back room and someone going through the window; that Clemmons ran out of the house, but, by the time he got outside, the person had gotten into a vehicle and left; that Clemmons came back into the house; that he was concerned for officer safety; that he did not know what Truss looked like; that, at that point, he and Clemmons were trying to secure the scene, get everyone still, and determine whether Truss was in the house; that he repeatedly asked the appellee if Truss was in the house and asked him to get Truss, but the appellee never responded; that the appellee was agitated; that he and Clemmons went through the house looking for Truss; that, when he was standing between a bedroom and a kitchen, he saw items that were used to manufacture methamphetamine in plain view on the bed and floor of the bedroom; that he did not enter the bedroom; that he immediately notified dispatch that he needed a supervisor; that Captain Law and Lieutenant Jacobs subsequently arrived on the scene; that, at that point, three of the rooms in the house had not been secured; that he, Clemmons, and Jacobs went through the rest of the house to secure the house for weapons or people; that he located Truss underneath a bed and located another male who had outstanding warrants underneath a baby bed; that he took Truss into custody; and that Jim England, a drug task force officer, subsequently arrived at the house. (R. 12, 13,14.)
Jim England testified that he worked for the Morgan County Sheriffs Department and was assigned to the Morgan County Drug Task Force; that, on August 7, 2003, he responded to a dispatch about a methamphetamine laboratory at a house on Whitten Road; that, when he arrived, Jacobs, Landers, and a deputy were there; that they told him that there was a methamphetamine laboratory in the house; that Landers walked with him to the kitchen area and pointed into a bedroom; that, in the bedroom, he saw two bottles of a two-phase liquid, one of which was a match strip soaking in a solution with red phosphorous, and a bottle that contained an off-white, fuel-colored liquid that is usually associated with camp fuel that is used *1087 during production; that those items were visible from the kitchen area; that there were women and children in the house; that he advised Jacobs and Landers to move everyone out of the house; that he then read the appellee his Miranda[1] rights and spoke to him briefly; that the appellee consented to a search of the house and signed a written consent form; that, to his knowledge, the appellee was not told that, if he did not consent, his wife would be arrested, the Department of Human Resources (“DHR”) would be called, and his children would be taken; and that he subsequently found more chemicals in the closet in the master bedroom. Finally, England testified that he talked to Truss; that Truss told him that he had been living in the house off and on; and that Truss said that he had been living there for three days at that time.
The appellee testified that, on August 7, 2003, his daughter told him that law enforcement officers were there; that Lan-ders was standing outside the door talking to his thirteen-year-old son; that Landers did not knock on the door; that another officer was with Landers; that Landers asked him if Truss was there; that he told Landers that a few people had been there and that he thought Truss had left with somebody; that Landers told him that he had reason to believe that Truss was there and that he was coming inside to look for him; that Landers did not tell him that he had a warrant; that he turned and went back toward the inside, and his daughter, Cherry, was with him; that he heard Lan-ders “hollering” and he came out of the bedroom; that Landers was in the living room and coming toward the kitchen where he was; that he did not give the officers permission to come inside; that Landers wanted to know where Truss was; that he told Cherry to tell Truss to come out if she knew where he was; that Lan-ders threatened to call DHR if no one told him where Truss was located; and that that was when Cherry told him where Truss was located. (R. 63.) He also testified that he subsequently signed a consent to search form because officers had already been in the house, because he believed that the damage had already been done, and because he did not want his wife to be arrested and his children taken to DHR. The appellee further testified that Truss was his common-law son-in-law; that Truss' was renting a trailer next door; that Truss lived with his father and would come over and work on the trailer; that Cherry and Truss had a four-month-old child together; and that Cherry and Truss were living together, but they would come over and stay at his house. However, he finally admitted that Truss had stayed in his house for the three days before the search and .that Cherry and Truss were living in his house.
Cherry Morgan testified that, on August 7, 2003, Landers arrived at her house; that Landers knocked more than once on the screen door that led to the screened porch; that she and her father had heard her little brother yell that the police were there; that she and her father met Lan-ders at the door; that Landers asked if Truss was there, and they told him he was not; that Truss was her boyfriend; that Landers came into the house; that she did not hear her father invite Landers inside; that Landers told them he had a warrant, but she did not see it; that Landers walked through the house and looked in each room; and that Landers did not ask her or her father if he could search the house.
In granting the motion to suppress, the trial court found that
*1088 “there was no reasonable belief that the location to be searched was the suspect’s dwelling, and to that extent that prong of Payton has not been met, therefore they didn’t have a right to go in to try to find Mr. Truss to execute the warrant.
[[Image here]]
“... Well, they didn’t know where he was, and they thought he lived in the trailer, and they — that is what I have ruled.”
(R. 155.) It also found that
“any consent to search given by the defendant — I think the totality of the circumstances would not have been knowing and voluntary, and I’m not saying it was coerced at all. That is not what I’m saying. To the extent that the information or the evidence had already been determined to be there at the scene and by the officers — he did not know — he could not withhold consent, then that was further my ruling.”
(R. 158-59.)
The State argues that the trial court erroneously granted the appellee’s motion to suppress. Specifically, it contends that the officers were at the appellee’s house to execute a valid arrest warrant for Truss; that the officers had reason to believe that Truss lived in the appellee’s house and was in the house at that time; and that, pursuant to Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the officers were justified in entering the ap-pellee’s house to execute the warrant.
“Although searches and seizures inside a home without a search warrant are presumptively unreasonable, in Payton v. New York, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980), the Supreme Court held that ‘for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.’ We have since held that Payton requires a two-part inquiry to determine if entry pursuant to an arrest warrant complies with the Fourth Amendment’s proscription of unreasonable searches. See United States v. Magluta, 44 F.3d [1530] at 1533 [(11th Cir. 1995)]. In particular, we have held that ‘first, there must be a reasonable belief that the location to be searched is the suspect’s dwelling, and second, the police must have “reason to believe” that the suspect is within the dwelling.’ Id. Elaborating on this inquiry, we have explained that ‘for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect’s dwelling, and that the suspect is within the residence at the time of entry.’ Id. at 1535. Furthermore, ‘in evaluating this on the spot determination, as to the second Payton prong, courts must be sensitive to common sense factors indicating a resident’s presence.’ Id. We believe such ‘common sense factors’ must also guide courts in evaluating the first Payton prong.”
United States v. Bervaldi, 226 F.3d 1256, 1262-63 (11th Cir.2000).
In State v. Hill, 690 So.2d 1201, 1203-04 (Ala.1996), the supreme court stated the following with regard to standards of review to be applied when reviewing a trial court’s ruling on a motion to suppress:
“ ‘As a preliminary matter, we note that there has been some debate regarding the applicable standard of appellate review. In its unpublished memorandum, the Court of Criminal Appeals showed great deference to the trial *1089 court’s decision to suppress the evidence of the cocaine and marijuana. It stated:
“ ‘[A] trial court’s ruling on a motion to suppress will not be disturbed unless it is “palpably contrary to the weight of the evidence.” Patterson v. State, 659 So.2d 1014 (Ala.Cr.App.1995). The trial court is in a far better [sic] than this court to rule on the merits of a motion to suppress. Sullivan v. State, 23 Ala.App. 464, 127 So. 256 (1930). The trial court’s ruling [on] the motion to suppress was not palpably wrong.’
“The State contends that the deference of the Court of Criminal Appeals to the judgment of the trial court was unwarranted. It claims that an appellate court should review de novo the trial court’s finding that ‘reasonable suspicion’ was lacking, because the facts in the case are not in dispute. We agree.
“The trial judge made his ruling following a hearing at which he heard oral testimony only from Officer Bailey. We stated in Ex parte Agee, 669 So.2d 102 (Ala.1995):
“ “Where evidence is presented to the trial court ore tenus in a nonjury case, a presumption of correctness exists as to the court’s conclusions on issues of fact; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. Odom v. Hull, 658 So.2d 442 (Ala.1995). However, when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court’s judgment. Ex parte Board of Zoning Adjustment of the City of Mobile, 636 So.2d 415 (Ala.1994).’
“669 So.2d at 104. “Where the evidence before the trial court was undisputed the ore tenus rule is inapplicable, and the Supreme Court will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court’s application of the law to those facts.’ Stiles v. Brown, 380 So.2d 792, 794 (Ala.1980) (citations omitted). The trial judge’s ruling in this case was based upon his interpretation of the term ‘reasonable suspicion’ as applied to an undisputed set of facts; the proper interpretation is a question of law.
■ “Hill counters with the argument that some facts are disputed, and he argues that the judge’s assessment of credibility was a key factor in his decision to suppress. It is true that, absent clear error, the trial court’s credibility choices on issues of fact at suppression hearings are binding on this Court. Powell v. State, 624 So.2d 220 (Ala.Cr.App.1993). However, Hill has not indicated what facts are in dispute. He presented no evidence at the hearing, and there was no evidence that conflicts with or tends to undermine the testimony given by Bailey. Hill also adopted the statement of facts as set out in the State’s brief, under Rule 39(k), Ala. RApp. P, adding only that the car was actually owned by Hill’s brother and that when it appeared that Heard might attempt to flee Bailey told Heard that he had a police dog in his vehicle, although Bailey had no such dog. But these two facts are not relevant to the question whether the officer had a ‘reasonable suspicion’ at the time he stopped the car. Thus, we review de novo the trial court’s ruling on the issue and the judgment of the Court of Criminal Appeals. Ex parte Agee, supra.”
(Emphasis added.)
A.
Initially, we must determine whether the trial court correctly determined that the officers in this case did not *1090 have a reasonable belief that Truss lived in the appellee’s house. Landers’ testimony-regarding the information about where Truss lived that he had obtained before he entered the house was not disputed. Although the testimony regarding whether Truss actually lived in the house was conflicting,
“[t]he ‘officers’ assessment need not in fact be correct; rather, they need only reasonably believe that the suspect resides at the dwelling to be searched and is currently present at the dwelling.’ Risse, 83 F.3d [212,] 216 [(8th Cir.1996)](internal quotation marks omitted.)”
United States v. Powell, 379 F.3d 520, 523 (8th Cir.2004). Therefore, whether Truss did, in fact, live in the appellee’s house was not relevant to the question of the reasonableness of the officers’ belief. Rather, the key in this case, and the basis for the trial court’s ruling on the motion to suppress, was the reasonableness of the officers’ belief, at the time they entered the house, that Truss lived in the house.
“[T]he ore tenus standard is inapplicable ‘where the evidence is undisputed, or where the material facts are established by the undisputed evidence.’ Salter v. Hamiter, 887 So.2d 230, 234 (Ala.2004).”
Burkes Mech., Inc. v. Ft. James-Pennington, Inc., 908 So.2d 905, 910 (Ala.2004) (emphasis added) (footnote omitted). Because this question deals with the trial court’s ápplication of the law to the undisputed facts that are material to this issue, we apply a de novo standard of review.
In this case, Landers testified that Truss’ father said that Truss was living with Cherry Morgan in a trailer on Whit-ten Road; that he and Clemmons went to the address that Truss’ father had given them and found a house with a trailer close behind it; that the trailer was vacant; that, when they walked around the trailer, they encountered a boy and asked him if he knew Truss, and the boy said he did; that he then asked the boy “ ‘Can you tell me — does he live here or where is he at?’ ” and the boy said that Truss was in the house; that he asked the boy if he could get Truss for him, and the boy said he could; that they followed the boy to the side of the house; that, when they got to the side of the house, the boy stopped and looked at him; that he again asked the boy if Truss was in the house, and the boy said he was; and that he asked the boy to get Truss. (R. 13.) Viewed in the totality, the officers’ knowledge, including the information they had received from Truss’ father and from the boy, coupled with the officers’ observations about the trailer, were sufficient to warrant a reasonable belief that Truss lived in the house. Therefore, the trial court incorrectly applied the law to the facts regarding the first prong of the Payton test.
B.
Next, we must determine whether the officers had a reasonable belief that Truss was in the house when they entered it. In ruling on the motion to suppress, the trial court did not address or make any findings of fact regarding this second prong of the Payton test. Also, even though there was conflicting testimony as to the circumstances surrounding the officers’ entry into the house, the trial court did not make any credibility choices regarding those conflicts. Therefore, we apply a de novo standard of review to this question.
Landers testified that, when he and Clemmons walked around the trailer, he saw a boy in the yard. When Landers questioned him about Truss, the boy indicated twice that Truss was in the house. Both the appellee and Cherry presented *1091 testimony that, before Landers entered the house, they had gone to the door and told Landers that Truss was not there. However, the key in this case is the reasonableness of the officers’ belief that Truss was in the house at that time. Even assuming that the trial court believed the appellee’s and Cherry’s testimony that they told Landers that Truss was not inside, Landers also testified that the boy said that Truss was in the house at that time. Therefore, the officers could have reasonably chosen to believe the boy, rather than the appellee and Cherry, and reasonably believed that Truss was in the house at the time they entered it.
Because the State presented evidence that, at the time they entered the house, the officers could have reasonably believed that Truss lived in the house and that Truss was in the house, their initial entry into the house was lawful. Therefore, the appellee’s subsequent consent was not rendered invalid by the fact that the officers had previously discovered the items in his bedroom. Consequently, the trial court erroneously granted the appellee’s motion to suppress the evidence law enforcement officers seized from his house. Accordingly, we reverse the trial court’s judgment and remand this case to that court for proceedings that are consistent with this opinion.
REVERSED AND REMANDED.
McMILLAN, PM., concurs; SHAW, J., concurs specially, with opinion, which COBB, J., joins; WISE, J., dissents as to the rationale in Part A and concurs in the result.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).