BASCHAB, Presiding Judge.
 

 The appellant, Jamie Ray Mills, was convicted of three counts of capital murder for the killings of Floyd Hill (“Floyd”) and Vera Hill (“Vera”). Count I charged him with the robbery-murder of Floyd,
 
 see
 
 § 13A-5-40(a)(2), Ala.Code 1975; Count II charged him with the robbery-murder of Vera,
 
 see
 
 § 13A-5-40(a)(2), Ala.Code 1975; and Count III charged him with murder made capital because he killed Floyd and Vera by one act or pursuant to one scheme or course of conduct,
 
 see
 
 § 13A-5-40(a)(10), Ala.Code 1975. After a sentencing hearing, by a vote of 11-1, the jury recommended that he be sentenced to death. The trial court accepted the jury’s recommendation and sentenced him to death. The appellant filed a motion for a new trial, which the trial court summarily denied. This appeal followed.
 

 
 *557
 
 The appellant does not challenge the sufficiency of the evidence to support his convictions. However, we have reviewed the evidence, and we find that it is sufficient to support the appellant’s convictions. The following summary of the relevant facts, as prepared by the trial court, may be helpful to an understanding of this case:
 

 “During the late afternoon of June 24, 2004, the defendant, 80 year old Jamie Ray Mills, and his common-law wife, JoAnn Mills, went to the home of Floyd and Vera Hill on County Road 54 in Guin, Marion County, Alabama, for the purpose of robbing them.... Mrs. Hill, 72 years old, was diabetic and in poor health and was cared for by her husband of 55 years, Floyd Hill, a spry gentleman 15 years her senior. At 87 years old, Mr. Hill cared for the needs of his ailing wife, to include administering her prescription drugs which he kept in a locked tackle box on the kitchen table. To ensure that her prescription drugs were administered properly and timely, he set his alarm clock to alarm every four hours. Although the Hills lived alone, their adult grandchildren who resided in the area frequently checked on their grandparents. Although both Hills were retired, they frequently held yard sales, no doubt more so to keep themselves occupied and working than to augment their Social Security income. Mr. Hill was known by the employees of the local Amoco service station (where defendant Mills was last employed prior to the murders) to carry large sums of cash in his pocket, always paying for his gas in cash.
 

 “Though Mills denied knowing either of the Hills, there was evidence from which the jury could have concluded that Mills, out of work at the time, certainly did know the Hills and preconceived a plot to rid them of their cash ... and, then brutally executed them with a machete, tire tool and ball-peen hammer. A detailed factual account of this horrendous, gutless and cowardly act follows.
 

 “Shortly after dark on June 24, 2004, following repeated failed attempts by Angela Jones to check on her grandparents by phone, Jones went to the residence of her grandparents, Floyd and Vera Hill. It appeared as if the Hills were home; however, the door was locked and knocks on the door resulted in no response. Angela summoned the Guin Police Department for a welfare check. Officer Larry Webb arrived at the residence in approximately three or four minutes. Upon Webb’s arrival, he was informed by Angela Jones that her family had spoken to the Hills shortly after 2:00 p.m., at which time they were fine. Officer Webb and Mrs. Jones then knocked on the doors and windows with no response from the Hills. Webb called the Hills’ home from his cell phone. It was detected that the phone was ringing on his cell phone, but there was no noticeable ring coming from inside the Hills’ home. Officer Webb then shined his flashlight into the house from the front porch, and Angela noticed that Vera Hill’s bed was empty and made, and her walker was in the living room. Mr. Hill’s alarm was sounding for Mrs. Hill’s medication, but no one stirred in the home. Mrs. Jones became fearful that something was terribly wrong. Webb then moved to the pre-fabricated building on the property (enclosed with x-type lattice and polyethylene type plastic) where the Hills had yard sale items stored. Because the door was padlocked, Webb pulled a small bench to the door and climbed up on the bench to look over the door.
 

 “Officer Webb saw Floyd Hill lying on his back at the rear of the building in a pool of blood with a bloody towel thrown over his face. Mr. Hill’s walking cane was across his lower legs. Webb then saw Vera Hill lying on her right side
 
 *558
 
 just inside the door. She was in a pool of blood and her head and face were bloody. Vera Hill moved her left arm.
 

 “At approximately 8:42 p.m., Webb notified 911 to send an ambulance, and then called for additional backup (Guin Police Chief Bryan McCraw and District Attorney Jack Bostick). Webb cut the plastic wall and tore away the lattice to gain entrance into the building where he checked Vera Hill’s condition. She was still breathing. Webb moved to Floyd Hill and found him to be cold to the touch with no pulse. Webb then noticed several long bloody gashes on Mrs. Hill’s head. When asked what happened, Vera Hill repeatedly stated, ‘Let me out of here.’ Once medical assistance had arrived, Vera Hill was transported by ambulance to the Winfield hospital. Floyd Hill was pronounced dead at the scene.
 

 “The scene was secured and a joint investigation was initiated by the Guin Police Department, the Marion County District Attorney’s Office, and the Alabama Department of Forensic Science. The crime scene was processed, photos were taken, blood samples were collected, and Vera Hill’s clothing and fingernail clippings were obtained.
 

 “During the processing of the victims’ home and belongings, it was discovered that Floyd Hill’s wallet, Vera Hill’s purse, and a green padlocked tackle box containing Vera Hill’s medication had been taken from the residence along with a police scanner, and the Hills’ phone, which had been cut from the phone line.
 

 “... Upon completion of the autopsy of Floyd Hill, the cause of death was determined to be blunt and sharp force injury to the head and neck.
 

 “Vera Hill later died on September 12, 2004 at the home of her daughter, Brenda Barger, while under the care of Hospice, two and a half months after having been transferred from the Winfield hospital to UAB Hospital in Birmingham, Alabama, where she was treated for brain injuries, a depressed skull fracture on the back of the head, fractures around her left eye, fractures to the nasal cavity, broken/fractured neck, and crushed hands.... Upon completion of the autopsy of Vera Hill, the cause of death in her case was determined to be complications of blunt head trauma.
 

 “At approximately 11:15 p.m. on June 24, 2004, Marion County District Attorney Investigators Tommy Moore and Ken Mays interviewed the Hills’ next door neighbor, Jennifer Yaden, at which time they were informed that Yaden had noticed a white late model four-door sedan going by her house several times earlier that day. She also observed this same vehicle parked in the Hills’ drive. At approximately 12:05 a.m. on June 25, 2004, Investigators Moore and Mays returned to the crime scene and discussed with Guin Police Chief Bryan McCraw and Officer Larry Webb the information they had obtained from Yaden. Both McCraw and Webb advised the investigators of a local man named Jamie Mills who drove a white car matching that described by Yaden. At this point, a patrol unit was sent to the residence of Jamie and wife, JoAnn Mills, but it appeared as if no one was home. Investigator Moore asked Chief McCraw to send a car to the Mills’ residence on a regular basis to see if the Mills were home for questioning.
 

 “At 9:45 a.m. on June 25, 2004, Guin Police Department Officers G.B. Blay-lock and Stanley Webb arrived at the Mills’ residence to find Jamie and JoAnn Mills attempting to leave their residence in a small white 1990 two-door Nissan
 
 *559
 
 Infíniti M30. The officers pulled crossways of the drive, blocking the Mills’ attempted exit. Officer Blaylock then asked Jamie Mills to back the car up in the drive so that Blaylock could talk to him. After doing so, Jamie Mills was then transported to the Guin City Hall for questioning about his whereabouts on June 24, 2004. At this time, Jamie Mills denied any knowledge of the Hills and stated that he and JoAnn were in Brilliant on June 24, 2004 looking at houses prior to going to his father’s home ... where he and JoAnn spent the night.
 

 “Marion County District Attorney Investigator Ted Smith and District Attorney Jack Bostick arrived at the Mills’ residence to question JoAnn Mills, who was on probation at the time, regarding her whereabouts at the time the Hills’ attack occurred. While being questioned by Investigator Ted Smith, JoAnn Mills gave consent for the search of the Mills’ home, white two-door sedan, and the trunk of the vehicle. In plain view in the car trunk was a green tackle box with a cut padlock matching the description of the tackle box in which Vera Hill’s medication was kept. Also in plain view was a large blue duffel bag that appeared to be splattered with blood. At this time, JoAnn Mills was read her
 
 Miranda
 
 rights, but she waived her rights and gave a statement. Guin Police Chief Brian McCraw and Officer Webb were then called to the residence and a search warrant was obtained. The search was conducted by officers from the Marion County Drug Task Force, the A.B.I. and the Guin Police Department. During this time, Jamie Mills was transported back to his residence where he was later placed under arrest for capital murder and transported to the Marion County Jail.
 

 “The search of the items contained in the vehicle’s trunk revealed that the green tackle box contained numerous pill bottles with prescriptions belonging to Vera Hill. The duffel bag contained an assortment of items including one large concrete block, one pair of size 12 tennis shoes with blood stains on them, one blood-stained pair of work pants with Jamie Mills’ name on the inside tab, one black t-shirt with blood stains, one pair of size 5½ tennis shoes with blood stains, one telephone with cut cord attached, one man’s wallet containing the driver’s license of James Floyd Hill, one ladies’ purse with papers identifying it as Vera Hill’s, one machete with blood and hair on it, one ball-peen hammer with blood on it wrapped in paper, and one lug nut tire tool. The items from inside the trunk were itemized and photographed before the car, toolbox, duffel bag and contents were handed over to forensic science for examination.
 

 “DNA analysis was later performed on the machete, hammer, tire tool, black t-shirt and black pants. Test results revealed that the primary source of blood found on the machete matched that of Floyd Hill and the secondary source matched that of Vera Hill. The blood found on the ball-peen hammer matched that of Vera Hill. The blood found on the tire tool was a mixture, with Vera Hill being the major contributor and Floyd Hill being the minor contributor. The blood on the black t-shirt matched that of Vera Hill. The blood on the pants (containing the tab with Jamie Mill’s name) matched that of Floyd Hill.
 

 “On August 22, 2007 during the trial of defendant Jamie Mills, JoAnn Mills testified that on June 23, 2004, she and her husband, Jamie Mills, had stayed up all night smoking methamphetamine at their residence. On Thursday, June 24,
 
 *560
 
 2004, they stayed at their residence until around 5:00 p.m. before going to Webster’s Market grocery (7270 U.S. Highway 43 in Guin, Alabama) to buy cigarettes. After the cigarettes had been purchased, she and Jamie left Webster’s and stopped in Fred’s store parking-lot to talk to JoAnn’s cousin, Brandy West. After leaving Fred’s parking lot, Jamie told JoAnn that he was going to talk to a man about some money and for her to just follow his lead. Upon reaching the Hills’ residence around 5:15 p.m., the Hills allowed the Mills into their home where Jamie attempted to make several phone calls from the Hills’ phone as JoAnn sat and talked with the Hills. According to JoAnn, Mr. Hill obviously knew Jamie and referred to him by name. After Jamie had used the phone and both couples had talked for awhile, Vera Hill wanted to show JoAnn Mills some of their yard sale items that were stored in their shed. Due to the rainy weather, Floyd Hill unlocked the padlocked building and opened the door while Vera Hill, Jamie Mills and JoAnn waited on the porch. Floyd Hill then returned and gave the women the umbrella so they could go on to the building. Floyd Hill went back into the house to get a light fixture and then returned to the building. After the Hills had shown the Mills their sale items, Jamie Mills continued to talk to Floyd Hill in the shed while the two women proceeded to walk back to the porch.
 

 “JoAnn Mills then testified that she heard a loud noise and saw a silhouette through the building’s plastic siding of what appeared to be Jamie Mills with something raised over his shoulder ‘with both hands, as if he was swinging something.’ JoAnn Mills then followed Vera Hill back into the shed to see what had happened. Upon entering the shed, JoAnn saw Floyd Hill lying on the ground and saw Jamie Mills hit Vera Hill in the back of her head with a hammer. When Mrs. Hill attempted to get up he struck her again with the hammer.
 

 “JoAnn further stated that she stood with her eyes closed in the corner of the building as she listened to the sound of Jamie Mills repeatedly striking Floyd and Vera Hill. She could hear the sound of Jamie’s feet scuffling on the ground as he went back and forth between the two victims. After the sounds of Jamie striking the Hills stopped, JoAnn Mills was then handed a hammer, a tire tool, and a machete by Jamie Mills and witnessed Jamie Mills place a white towel over Floyd Hill’s head to silence the gurgling sounds coming from Mr. Hill. Jamie and JoAnn Mills then exited the shed. Jamie padlocked the door shut and the two went back into the Hills’ home. Inside the Hills’ home, Jamie and JoAnn went through the house and took a padlocked tackle box, Vera’s purse, the phone, and the police scanner before leaving the residence and returning to their residence on County Road 83.
 

 “Upon reaching the Mills’ residence, Jamie brought all the items from the Hills’ residence into the kitchen. JoAnn took a shower. Jamie and JoAnn then went through the items taken from the Hills’ residence (wallet, purse, medication contained in the green tackle box) and placed them along with the hammer, tire tool and machete in a bag. The Mills recovered about $140 cash from the Hills. Jamie then took a shower and called Benji Howe, a known drug abuser in the area. Benji Howe came over to the Mills’ home and purchased some pain pills. After Benji left the Mills’ residence, Jamie and JoAnn placed the
 
 *561
 
 bag containing the items from the Hills’ residence in the shed on their property before going to Jamie’s father’s residence in Hamilton, Alabama, to play do-minos and spend the night.
 

 “The next morning, June 25, 2004, Jamie and JoAnn Mills returned to their residence to find that dogs had torn into the bag containing the bloody items from the Hills’ residence. JoAnn retrieved a large blue duffel bag and the Mills placed into the bag the machete, hammer, tire tool, telephone, wallet, purse, the clothes the Mills had worn at the time of the attacks, and one heavy cement block. The Mills then placed the duffel bag in the trunk of their car along with the green tackle box. As the two were leaving the residence to obviously dispose of the duffel bag and tackle box, they were stopped by Guin Police Officers G.B. Blaylock and Stanley Webb.”
 

 (C.R. 128-29.)
 

 /.
 

 The appellant argues that the trial court should have granted his motion to suppress evidence law enforcement officers seized from the trunk of his vehicle pursuant to a warrantless search.
 

 “All evidence obtained by a search that is conducted in violation of the Constitution of the United States is inadmissible in a state court.
 
 Mapp v. Ohio,
 
 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961);
 
 Loyd v. State,
 
 279 Ala., 447, 186 So.2d 731 (1966). The Fourth Amendment to the Constitution of the United States bans all unreasonable searches.
 
 Terry v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Whether a search is unreasonable depends upon the facts and circumstances of the particular case.
 
 Sibron v. New York,
 
 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Warrantless searches are per se unreasonable unless they fall within a recognized exception.
 
 Ex parte Hilley,
 
 484 So.2d 485 (Ala. 1985). Those exceptions include: objects in plain view, consensual searches, a search incident to a lawful arrest, hot pursuit or emergency situations, probable cause coupled with exigent circumstances, and a
 
 Terry
 
 ‘stop and frisk’ situation.
 
 Daniels v. State,
 
 290 Ala. 316, 276 So.2d 441 (1973). Where a search is executed without a warrant, the burden falls upon the State to show that the search falls within an exception.
 
 Kinard v. State,
 
 335 So.2d 924 (Ala.1976).”
 

 Ex parte Tucker,
 
 667 So.2d 1339, 1343 (Ala.1995). Consent to search may be given by a third party who possesses common authority over the premises or personal effects sought to be searched.
 
 See United States v. Matlock,
 
 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974);
 
 James v. State,
 
 681 So.2d 269 (Ala.Crim. App.1996);
 
 Smiley v. State,
 
 606 So.2d 213 (Ala.Crim.App.1992).
 

 In
 
 State v. Hill,
 
 690 So.2d 1201, 1203-04 (Ala.1996), the supreme court stated the following with regard to standards of review to be applied when reviewing a trial court’s ruling on a motion to suppress:
 

 “As a preliminary matter, we note that there has been some debate regarding the applicable standard of appellate review. In its unpublished memorandum, the Court of Criminal Appeals showed great deference to the trial court’s decision to suppress the evidence of the cocaine and marijuana. It stated:
 

 “ ‘[A] trial court’s ruling on a motion to suppress will not be disturbed unless it is “palpably contrary to the weight of the evidence.”
 
 Patterson v. State,
 
 659 So.2d 1014 (Ala.Cr.App. 1995). The trial court is in a far better [sic] than this court to rule on
 
 *562
 
 the merits of a motion to suppress.
 
 Sullivan v. State,
 
 23 Ala.App. 464, 127 So. 256 (1930). The trial court’s ruling [on] the motion to suppress was not palpably wrong.’
 

 “The State contends that the deference of the Court of Criminal Appeals to the judgment of the trial court was unwarranted. It claims that an appellate court should review de novo the trial court’s finding that ‘reasonable suspicion’ was lacking, because the facts in the case are not in dispute. We agree.
 

 “The trial judge made his ruling following a hearing at which he heard oral testimony only from Officer Bailey. We stated in
 
 Ex parte Agee,
 
 669 So.2d 102 (Ala.1995):
 

 “ “Where evidence is presented to the trial court
 
 ore tenus
 
 in a nonjury case, a presumption of correctness exists as to the court’s conclusions on issues of fact; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.
 
 Odom v. Hull,
 
 658 So.2d 442 (Ala.1995).
 
 However, when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court’s judgment. Ex parte Board of Zoning Adjustment of the City of Mobile,
 
 636 So.2d 415 (Ala.1994).’
 

 “669 So.2d at 104. ‘Where the evidence before the trial court was undisputed the ore tenus rule is inapplicable, and the Supreme Court will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court’s application of the law to those facts.’
 
 Stiles v. Brown,
 
 380 So.2d 792, 794 (Ala. 1980) (citations omitted).
 
 The trial judge’s ruling in this case was based upon his interpretation of the term ‘reasonable suspicion’ as applied to an undisputed set of facts; the proper interpretation is a question of law.
 

 “Hill counters with the argument that some facts are disputed, and he argues that the judge’s assessment of credibility was a key factor in his decision to suppress. It is true that, absent clear error, the trial court’s credibility choices on issues of fact at suppression hearings are binding on this Court.
 
 Powell v. State,
 
 624 So.2d 220 (Ala.Cr.App.1993). However, Hill has not indicated what facts are in dispute. He presented no evidence at the hearing, and there was no evidence that conflicts with or tends to undermine the testimony given by Bailey. Hill also adopted the statement of facts as set out in the State’s brief, under Rule 39(k), Ala. R.App. P, adding only that the car was actually owned by Hill’s brother and that when it appeared that Heard might attempt to flee Bailey told Heard that he had a police dog in his vehicle, although Bailey had no such dog. But these two facts are not relevant to the question whether the officer had a ‘reasonable suspicion’ at the time he stopped the car. Thus, we review de novo the trial court’s ruling on the issue and the judgment of the Court of Criminal Appeals.
 
 Ex parte Agee,
 
 supra.”
 

 (Emphasis added.)
 

 “ ‘In reviewing a trial court’s ruling on a motion to suppress, this Court may consider the evidence adduced both at the suppression hearing and at the trial.’
 
 Henry v. State,
 
 468 So.2d 896, 899 (Ala. Crim.App.1984), cert, denied, 468 So.2d 902 (Ala.1985).”
 

 Smith v. State,
 
 797 So.2d 503, 526 (Ala. Crim.App.2000).
 

 During the investigation on the night of the murders, a neighbor told law enforcement officers she had seen a white vehicle parked in the Hills’ driveway that afternoon. Officer Larry Webb of the Guin
 
 *563
 
 Police Department testified that officers tried to generate possible suspects based on that vehicle description; that he came up with the appellant and Benjie Howe; that he knew the appellant had either lost or quit his job in the weeks before the murders; that he knew the appellant was staying at home through the day; that Howe, who was a known drug user and drug dealer, had been frequenting the appellant’s home during the weeks before the murders; that JoAnn’s mother and stepfather lived about two houses around the corner from the victims; that JoAnn had lived at her mother’s house at some point; and that he had seen the appellant there several times.
 

 On the night of the murders, law enforcement officers went by the appellant’s house several times, but no one was home. The next morning, officers received information that the appellant was at home. The State presented evidence that Ted Smith, an investigator and trial coordinator in the district attorney’s office, District Attorney Jack Bostick, and Chief Bryan McCraw of the Guin Police Department had been talking, and Smith wanted to talk to the appellant’s common-law wife, JoAnn Mills, alone; that McCraw asked Assistant Chief G.B. Blaylock to go to the appellant’s house, pick him up, and bring him in for questioning; that Blaylock and Stanley Webb went to the appellant’s house; that, when they arrived, the appellant and JoAnn were about to leave in a white vehicle; that Blaylock pulled into the driveway and asked the appellant to back up so he could talk to him; that he asked the appellant if he could come with him, and the appellant said, “ ‘Okay. Sure’ ”; and that the appellant got in his vehicle and rode with him and Webb to city hall. (R. 681.)
 

 The State also presented evidence that, after Blaylock and Webb left with the appellant, Smith and Bostick went to the appellant’s house; that, when they arrived, JoAnn had gotten out of her vehicle and was going back inside; that Smith got out and talked to JoAnn; that Smith asked JoAnn to give him an account of where she and the appellant had been since noon the previous day, and JoAnn gave him a time line; that, at that time, JoAnn stated that she had already been in trouble one time for receiving stolen property and that she did not want to get into trouble again; that JoAnn invited Smith to come inside and go through the house with her; that, at that point, Smith had not asked to search the house; that JoAnn showed Smith three items in the house; that JoAnn was not sure if the items were stolen and said that Howe had brought them there about one week earlier; that, at that point, JoAnn told Smith they could look at anything they wanted to in the house; and that they walked through the house.
 

 Smith testified that they subsequently went outside; that he asked JoAnn if he could look in the vehicle, and she said “ ‘[S]ure’ ”; that JoAnn went to the vehicle and assisted him in looking through the passenger compartment; that there was a duffel bag full of clothes in the passenger’s compartment; and that JoAnn went through the clothing, asked if he wanted to look in the bag, and took the clothes out of the bag.
 

 He also testified that he asked JoAnn if he could look in the trunk of the vehicle, and she said, “ ‘[Y]ou haven’t even told me what you’re looking for yet’ ”; that he asked her if there were drugs in the trunk, and she said she did not know what was in the trunk; that JoAnn asked if she could talk to the appellant about getting permission to look in the trunk; that JoAnn said, “ Why don’t we call [the appellant] and ask him?’ ”; and that he told JoAnn that,
 
 *564
 
 because she was the appellant’s wife, she had legal authority to give them permission to look in the trunk. (R. 123, 124, 129.) He also testified that he had been talking to JoAnn; that he asked Bostick to contact Wayne Maddux, who was JoAnn’s probation officer; that he had previously been a probation and parole officer and knew that probation officers have more authority to search than regular law enforcement officers; that JoAnn’s probation was conditioned on allowing a search; and that the requirements for a probation officer to search were not as stringent as for a regular law enforcement officer. Smith further testified that, at that point in time, he did not have probable cause to believe that there was any evidence in the trunk linking the appellant and JoAnn to the Hill case, but he did have a reasonable suspicion that there might be contraband in the trunk; that that was why he asked Mad-dux to come to the scene; that Maddux was actually contacted; that, before Mad-dux arrived, JoAnn said, ‘“Go ahead and look’ ”; that there were not any threats or promises made to JoAnn before that; that JoAnn was not told that she better consent to the search or that her probation would be revoked if she did not consent to the search; and that JoAnn decided to consent on her own. (R. 126-27.) Finally, he testified that JoAnn never refused to give him permission to look in the trunk.
 

 Wayne Maddux testified that he was a probation and parole officer for the appellant and JoAnn; that both were actively on probation on June 24-25, 2004; that, on June 25, 2004, Bostick contacted him and told him they needed to search a vehicle that belonged to the appellant and JoAnn because it might contain drugs or stolen merchandise that was involved in a murder; that one condition of the appellant’s and JoAnn’s probation was that they agree to searches of their persons, property, and vehicles by the probation office; and that the appellant and JoAnn had both agreed to submit to those conditions. He also testified that, by the time he arrived, JoAnn had already given consent to look in the trunk and that the trunk was open when he got there.
 

 A
 

 Initially, the appellant contends that the search was not valid pursuant to the consent exception to the warrant requirement. Citing
 
 Georgia v. Randolph,
 
 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), he asserts that JoAnn’s consent was not valid to authorize a search of the trunk because law enforcement officers purposely removed him from his house to prevent him from objecting to the search.
 

 In
 
 Randolph,
 
 law enforcement officers responded to a call at the home of Randolph and his wife. Randolph’s wife told officers that Randolph had taken their son after a domestic dispute; that he used cocaine, and his cocaine habit had caused financial troubles; that she and Randolph had had marital problems; and that she and their son had recently returned home after staying with her parents for several weeks. Subsequently, Randolph returned home and explained that he had taken the child to a neighbor’s house because he was concerned that his wife might take the child out of the country again. He also denied that he used cocaine and said that his wife abused drugs and alcohol. After an officer and Randolph’s wife went and got the child, Randolph’s wife told the officer that there were “ ‘ “items of drug evidence” ’ ” in the house.
 
 Randolph,
 
 547 U.S. at 107, 126 S.Ct. at 1519. The officer asked Randolph for permission to search the house, and Randolph refused. The officer then obtained Randolph’s wife’s consent to search the house.
 

 
 *565
 
 Randolph argued that his wife’s consent to the search of his house was not valid because he had expressly refused to consent to the search. In addressing this issue, the United States Supreme Court stated:
 

 “[I]f a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant’s permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.
 

 “This is the line we draw, and we think the formalism is justified.
 
 So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection,
 
 there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant’s permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant’s contrary indication when he expresses it. For the very reason that
 
 [Illinois v.] Rodriguez
 
 [, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990),] held it would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent, we think it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received. There is no ready reason to believe that efforts to invite a refusal would make a difference in many cases, whereas every co-tenant consent case would turn into a test about the adequacy of the police’s efforts to consult with a potential objector. Better to accept the formalism of distinguishing
 
 [United States v.] Matlock
 
 [, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974),] from this case than to impose a requirement, time-consuming in the field and in the courtroom, with no apparent systemic justification. The pragmatic decision to accept the simplicity of this line is, moreover, supported by the substantial number of instances in which suspects who are asked for permission to search actually consent, albeit imprudently, a fact that undercuts any argument that the police should try to locate a suspected inhabitant because his denial of consent would be a foregone conclusion.”
 

 Randolph,
 
 547 U.S. at 121-22, 126 S.Ct. at 1527-28 (emphasis added; footnote omitted).
 

 Based on the emphasized language in
 
 Randolph,
 
 the appellant asserts that, if law enforcement officers remove an individual from the residence for the purposes of preventing him from objecting to the search, the individual’s co-tenant’s consent to search would not be valid. However, the language in
 
 Randolph
 
 regarding law enforcement officers removing a potentially objecting tenant for the sake of avoiding a possible objection is mere
 
 dicta.
 
 Therefore, the language about the removal of a potentially objecting tenant is not controlling precedent in this case.
 

 Moreover, even if the language in
 
 Randolph
 
 applied in this case, the appellant is not entitled to relief as to this claim. Smith testified that he had known JoAnn for several years; that he believed he had a rapport with JoAnn and might be able to talk to her; that he knew the appellant, but not as well as he knew JoAnn; that he asked officers with the Guin Police Department to pick up the appellant so he could talk to JoAnn without the appellant being
 
 *566
 
 present; and that he and Bostick went to the appellant’s house. He also testified that he did not go to the appellant’s house specifically to search; that he went to the appellant’s house to gain information; and that he instigated the search only after he gained information from JoAnn. Further, the defense did not present any evidence that law enforcement officers removed the appellant from his house to prevent him from objecting to a search of the vehicle. Based on this evidence, the trial court could have reasonably concluded that law enforcement officers did not remove the appellant from the house for the sole purpose of preventing him from objecting to the search of the vehicle. Accordingly, it properly denied the appellant’s motion to suppress on this ground.
 

 B.
 

 The appellant also appears to contend that JoAnn did not voluntarily consent to the search of the trunk of the vehicle. Specifically, he asserts that, when officers asked about searching the trunk of the vehicle, JoAnn said she would have to check with him first; that the officers told her it was not possible to talk to him; that the officers then threatened to contact her probation officer; and that, at that time, she consented to the search of the trunk.
 

 “One of the exceptions to the rule that a warrantless search is
 
 per se
 
 unreasonable is a search conducted with the consent of the owner.
 
 Rokitski v. State,
 
 715 So.2d 859 (Ala.Crim.App.1997);
 
 Chevere v. State,
 
 607 So.2d 361 (Ala. Crim.App.1992). The burden lies with the State to show that the search falls within an exception to the warrant requirement.
 
 Rokitski v. State,
 
 715 So.2d at 861. Whether the defendant’s consent to search was voluntary is a question of fact for the trial court to determine, based upon the totality of the circumstances.
 
 Id. See also Schneckloth v. Bustamonte,
 
 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). However, ‘[n]o particular factor should be given undue weight in determining the issue of voluntariness.’
 
 Rokitski v. State,
 
 715 So.2d at 861.”
 

 Foldi v. State,
 
 861 So.2d 414, 422 (Ala. Crim.App.2002).
 

 The State presented evidence that, on June 25, 2004, JoAnn was on probation. Smith testified that, after he asked her about searching the trunk, JoAnn asked about telephoning the appellant; that he told her that that would not be possible and that she had the authority to consent to the search because she was the appellant’s wife; that, at some point, he asked Bostick to contact Maddux because a probation officer has greater authority to search; that he did not threaten JoAnn or make any promises to her; that JoAnn was not told that her probation would be revoked if she did not consent to the search; and that JoAnn decided to consent on her own. The State also presented evidence that Maddux was on his way to the appellant’s house when JoAnn consented to the search and that one condition of JoAnn’s probation was that she agreed to searches of her person, property, and vehicles.
 

 At trial, JoAnn testified that, after the appellant left with law enforcement officers on the morning of June 25, 2004, she got out of their vehicle and was going into the house when Bostick and Smith arrived; that Smith came and talked to her; that Smith asked her to account for where she had been the day before; that she told him she and the appellant had been looking at houses; that she asked Smith if he would like to come in; that she showed him around the house; that they went back outside; that Smith asked about looking in the vehicle, and she showed him a bag of
 
 *567
 
 clothes from where they spent the previous night at the appellant’s father’s house; that, at some point, Smith asked to look in the trunk of the vehicle; that she asked him if he would contact the appellant at city hall; that Smith asked her if she had anything to hide; and that she said she did not, that it was the appellant’s vehicle, and that she would rather him ask the appellant. She also testified that she was on probation on June 25, 2004; that, at some point, her probation officer was contacted and was on his way to the house; that, at that time, she gave Smith consent to look in the trunk; that she was not threatened or coerced; that she was not promised anything in exchange for consenting, but she was told that, if there were drugs in the vehicle, she would get a “free pass” on the drugs; and that, at that point, she said, “[G]o ahead.” (R. 719.)
 

 Based on this testimony, the trial court could have reasonably concluded that JoAnn voluntarily consented to the search of the trunk of the vehicle and that law enforcement officers did not coerce her. Therefore, the trial court properly denied the appellant’s motion to suppress on this ground.
 

 II.
 

 The appellant also argues that the trial court erroneously allowed Dr. Kenneth Snell of the Alabama Department of Forensic Sciences (“DFS”) to testify about the causes of the victims’ deaths and also erroneously allowed the State to introduce the autopsy reports into evidence. Specifically, he contends that the trial court should have excluded Snell’s testimony and the autopsy report because they were both based on the notes and findings of Dr. Johnny Glenn, who allegedly “was so mentally incapacitated at the time of the autopsies that he was unable to do much of his work and was forced to retire shortly thereafter because of advanced alzheimers disease.” (Appellant’s brief at p. 11.)
 

 Glenn performed the autopsy on Floyd on June 25, 2004, and performed the autopsy on Vera on September 14, 2004. Sometime after he had performed the autopsies, Glenn left DFS because he had been diagnosed with Alzheimer’s disease. Subsequently, James Lauridson prepared autopsy reports. At trial, Snell testified regarding the causes of the victims’ deaths.
 

 Initially, we note that the autopsy reports were not admitted into evidence during the appellant’s trial. Rather, the defense admitted the reports as exhibits only for the hearing on the admissibility of Snell’s testimony. Therefore, the appellant’s argument regarding the autopsy reports is moot.
 

 With regard to Snell’s testimony, during an off-the-record discussion, the defense stated that it expected the State to call a witness to testify as to the causes of death based on Glenn’s autopsy notes and based on the autopsy photographs; that Glenn was apparently incompetent at the time of the autopsies; and that it would object to the State witness drawing conclusions based on the notes of someone who was incompetent at the time he took the notes. The defense then stated that it would like to conduct a voir dire examination out of the presence of the jury to determine what information the witness intended to use to form his opinion. After the State qualified Snell as an expert, the defense conducted a voir dire examination of Snell. Thereafter, the appellant did not argue that the trial court should exclude Snell’s testimony. Also, the appellant did not object when Snell testified before the jury as to the causes of death. Therefore,
 
 *568
 
 we question whether he properly preserved this argument for our review.
 

 Moreover,
 

 “[i]t is well settled that any challenge to the facts upon which an expert bases his opinion goes to the weight, rather than the admissibility, of the evidence.
 
 Dyer v. Traeger,
 
 357 So.2d 328, 330 (Ala. 1978).”
 

 Baker v. Edgar,
 
 472 So.2d 968, 970 (Ala. 1985). During the discussion about Snell’s testimony, the district attorney informed the trial court that Glenn was no longer with DFS because he had developed Alzheimer’s disease; that he did not think that Alzheimer’s disease was an issue during Floyd’s autopsy; and that Alzheimer’s disease was possibly manifesting itself during Vera’s autopsy. Defense counsel asserted that he had read in the newspaper that Glenn had resigned in early Fall 2004 and that Glenn’s work was left in disarray.
 

 Mathis Dyer testified that he had worked with DFS as a death investigator; that he was present during the autopsies of Floyd and Vera; that he probably made some of the photographs, but sometimes the medical examiner took some as well; and that he was present when the photographs from Floyd’s and Vera’s autopsies were made.
 

 Gerald Howard testified that he was a forensic pathology technician at DFS; that he assisted the pathologist in all aspects of the autopsy; and that this included making photographs, helping with the identification, the evisceration, the clean up, and maintaining the facilities used to do the autopsy. He also testified that he was present during the autopsies of Floyd and Vera; that he was involved in collecting evidence, evisceration, and processing the evidence that was collected during the autopsies; that Glenn supervised, dictated, and took notes; that, if there was something Glenn needed to look at closer, he would come in, look, and make sure it was noted and photographed; and that Glenn made sure they noted anything significant that happened during the autopsy.
 

 Snell testified that, in determining the cause of Floyd’s death, he relied on the autopsy report prepared by Lauridson and the autopsy photographs. In determining the cause of Vera’s death, he relied on her discharge summary from the University of Alabama Birmingham Hospital, which discussed her course of treatment while she was in the hospital; an autopsy report that had been prepared by Lauridson and that was based on Glenn’s notes; the autopsy photographs; and a diagram Glenn generated at the time of the autopsy. With regard to the autopsy reports, Snell testified that he relied strictly on the factual portions of the reports to form his opinions; that he did not initially read the opinion portions of the reports; that he made his determination as to the causes and manner of the victims’ deaths; and that he then compared his findings with Lauridson’s findings in the autopsy reports. He also testified that he reviewed a cause of death letter Glenn had written to the coroner regarding Floyd; that he did not actually rely on the letter to formulate his opinion as to the cause of death; that he simply reviewed the letter; and that, in his opinion, it was accurate. Finally, he testified that his opinion as to the causes of the victims’ deaths was in agreement with the opinions of Lauridson and Glenn; that the factual portions of the autopsy report comported with Glenn’s diagram of Vera; that the autopsy photographs and the autopsy reports were in agreement; and that, if he had had any disagreements with the opinions of Glenn and Lauridson, he would have had difficulty saying that he believed the reports to be true.
 

 The State presented evidence that Dyer and Howard were present during the au
 
 *569
 
 topsy, that Howard assisted in all portions of the autopsy, and that the autopsy diagram and autopsy reports were consistent •with the photographs. Also, there was not any evidence indicating that there were irregularities in the autopsies or that the photographs from the autopsies were inaccurate. Therefore, Snell properly based his opinions on the photographs and autopsy reports. Furthermore, even if Glenn was incompetent at the time of either autopsy, any challenge to the facts that formed the basis for Snell’s opinion went to the weight the jury assigned to his testimony. Therefore, there was not any error, much less plain error, in the admission of Snell’s testimony regarding the causes of death.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 III.
 

 The appellant further argues that the trial court erred when it did not allow him to elicit testimony regarding JoAnn’s mental illness. Specifically, he contends that the jury would have been able to use that evidence to weigh her credibility.
 

 “The credibility of a witness may be attacked by showing mental incapacity, but only if the incapacity exists at the time the witness testifies, or existed at the time of his observation of the incident about which he testifies.
 
 Stewart v. State,
 
 398 So.2d 369 (Ala.Crim.App. 1981),
 
 cert. denied,
 
 398 So.2d 376 (Ala. 1981).”
 

 Ex parte Tucker,
 
 474 So.2d 134, 136 (Ala. 1985).
 

 During the defense’s cross-examination of JoAnn, the following occurred:
 

 “[DEFENSE COUNSEL:] Do you remember going down to Taylor Hardin Secure Medical Facility?
 

 “[PROSECUTOR]: Judge, I’m going to object to anything about a mental examination without the expert—
 

 “THE COURT: Okay. Ladies and gentlemen, we’re going to go ahead and take a lunch break.
 

 “(The jury exited the courtroom, at which time the following took place.)
 

 [[Image here]]
 

 “THE COURT: ... Do y’all have something you want to put on the record, something about — you made an objection about Taylor Hardin?
 

 “[PROSECUTOR]: Yes, sir. Her Taylor Hardin report, of course, obviously, you know, the front page of that report is that it is confidential, and that is to go in her case file. It’s for the Court, her attorney and myself, and I didn’t think it was appropriate to go into in Jamie Mills’ trial.
 

 “THE COURT: I haven’t seen it. It’s not in this file. I presume it’s in her file.
 

 “[PROSECUTOR]: Yes, sir.
 

 “THE COURT: I’ve not seen it. What areas were you going to cross-examine her on with regard to that report?
 

 “[DEFENSE COUNSEL]: I was just going to — that she’s been evaluated, that somebody thought it was significant enough or her mental state was in such a condition that she needed to be evaluated to see if she was competent.
 

 “THE COURT: What does the report say? Is she?
 

 “[DEFENSE COUNSEL]: Well, yeah. They always say that. It’s just—
 

 “THE COURT: No, they don’t either.
 

 “[DEFENSE COUNSEL]: Well, competent to stand trial and, you know, competent to assist in her own defense.
 

 
 *570
 
 “[COUNSEL FOR JOANN]: Your Honor, as her attorney it is my general practice to always have a capital murder client evaluated to see if that could be an issue in the case.
 

 “THE COURT: And that was your request then? That was subject to your request?
 

 “[COUNSEL FOR JOANN]: Yes, Your Honor.
 

 “THE COURT: And did the report say she was competent to stand trial?
 

 “[COUNSEL FOR JOANN]: Yes, Your Honor, it did.
 

 “THE COURT: All right. Then we’re not going into it unless you can show me some specific reason why you want to go into it other than just so that it will show somebody at Taylor Hardin questioned her, and I think they’ve already heard that.
 

 “[DEFENSE COUNSEL]: Yeah, I think—
 

 “THE COURT: Let’s don’t revisit it unless you revisit with me and tell me where you’re going.
 

 “[DEFENSE COUNSEL]: I won’t. Yes, sir.
 

 “THE COURT: Okay?
 

 “[DEFENSE COUNSEL]: Yes, sir.”
 

 (R. 751-55.)
 

 In this case, the appellant did not attempt to offer any evidence that JoAnn was actually mentally incapacitated or mentally ill at the time of the murders or at the time of trial. Rather, he simply wanted to introduce the fact that she had been evaluated at Taylor Hardin. Because there was not any evidence that JoAnn was actually mentally incapacitated or suffering from a mental illness, the trial court properly sustained the State’s objection.
 

 TV.
 

 Finally, the appellant argues that the State did not disclose the fact that it had a plea agreement with JoAnn.
 

 “In
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court held that a jury was entitled to know of deals or consideration given in exchange for testimony. The Court held that jury knowledge of a deal between the State and a witness is relevant to an issue of the witnesses’s credibility.
 
 Id.”
 

 Ex parte Bankhead,
 
 585 So.2d 112, 121 (Ala.1991), rev’d on other grounds, 625 So.2d 1146 (Ala.1993).
 

 In this case, JoAnn testified that she had not made any deals in exchange for her testimony. Also, the appellant thoroughly cross-examined her regarding whether she had made any deals in exchange for her testimony. Finally, the prosecutor stated that the State had not made any promises to JoAnn; that the State had not suggested that a promise might be made after she testified truthfully; and that there was not any inducement whatsoever for JoAnn’s testimony.
 

 In an unverified motion for a new trial, defense counsel asserted:
 

 “The co-defendant Jo Ann Mills whose self serving testimony constituted the sole direct evidence against the defendant perjured herself by declaring that her testimony was given neither in an attempt to procure leniency for herself, nor pursuant to an expressed or implied plea bargain agreement or arrangement, nor as a result of an expresses or implied offer of leniency. Charged with three counts of capital murder she in fact pleaded guilty to murder and was sentenced to life in prison thirty days after the verdict in this case.”
 

 
 *571
 
 (C.R. 120.) The motion for a new trial did not include any evidence to indicate that JoAnn had in fact made a deal with the State at the time of trial. Rather, the motion was based on counsel’s bare assertions that JoAnn had committed perjury and that she had subsequently pled guilty to a lesser included offense.
 

 “There is no error in a trial court’s denial of a motion for new trial where no evidence is offered in support of that motion.
 
 Tucker v. State,
 
 454 So.2d 541, 547-48 (Ala.Cr.App.1983), reversed on other grounds, 454 So.2d 552 (Ala.1984);
 
 McKinnis v. State,
 
 392 So.2d 1266, 1269 (Ala.Cr.App.1980), cert. denied, 392 So.2d 1270 (Ala.1981). The motion itself was unverified and was not accompanied by any supporting affidavits. Consequently, the assertions of counsel contained therein ‘are bare allegations and cannot be considered as evidence or proof of the facts alleged.’
 
 Thompson v. State,
 
 444 So.2d 899, 902 (Ala.Cr.App. 1984) (quoting
 
 Daniels v. State,
 
 416 So.2d 760, 762 (Ala.Cr.App.1982));
 
 Smith v. State,
 
 364 So.2d 1, 14 (Ala.Cr. App.1978). Similarly, statements made by counsel during a hearing on a motion for new trial cannot be considered evidence in support of the motion.
 
 Vance v. City of Hoover,
 
 565 So.2d 1251, 1254 (Ala.Cr.App.1990).”
 

 Arnold v. State,
 
 601 So.2d 145, 154-55 (Ala.Crim.App.1992).
 
 See also Blount v. State,
 
 557 So.2d 1333 (Ala.Crim.App.1989).
 

 Because the appellant did not present any evidence that the State actually had an agreement with JoAnn at the time of trial, the trial court properly denied his motion for a new trial on this ground.
 

 V.
 

 The State argues that we should remand this case for the trial court to correct its sentencing order regarding the existence or nonexistence of aggravating circumstances.
 

 A
 

 Initially, the State contends that the trial court improperly found the existence of the aggravating circumstance that the appellant had previously been convicted of another capital offense or felony involving the use or threat of violence to the person pursuant to § 13A-5-49(2), Ala. Code 1975. Section 13A-5-49(2), Ala.Code 1975, provides that the following is an aggravating circumstance:
 

 “The defendant was previously convicted of
 
 another
 
 capital offense or a felony involving the use or threat of violence to the person.”
 

 (Emphasis added.) In its sentencing order, the circuit court found as follows:
 

 “The jury found the defendant guilty beyond a reasonable doubt of murder, pursuant to one scheme or course of conduct, of two persons as alleged in Count Three of the Indictment. Although the proof of this double murder does not neatly fit within the exact wording of the second aggravating circumstances set out in Section 13A-5-49, contemporaneous capital murders should be each aggravating circumstance as to the other. Each, in essence, is a conviction of another capital offense, a felony invoking the use of violence in committing the murder of the other victim. [Section 13A-5-49(2) ].”
 

 (C.R. 130.)
 

 Unlike the Habitual Felony Offender Act, the aggravating circumstance set forth in § 13A-5-49(2), Ala.Code 1975, does not require that the other offense occur before the capital offense for which the defendant is currently being prosecuted.
 
 See
 
 § 13A-5-39(6), Ala.Code 1975;
 
 Ex parte Coulter,
 
 438 So.2d 352 (Ala.1983);
 
 *572
 

 Riley v. State,
 
 892 So.2d 471 (Ala.Crim. App.2004). However, strictly construing the language of § 13A-5-49(2), Ala.Code 1975, it is reasonable to conclude that the legislature intended for this aggravating circumstance to apply only to an offense that is separate from the one for which the defendant is currently being prosecuted. Because the offenses in this case were part of one course of conduct and were being prosecuted at the same time, we agree that the trial court erroneously found the existence of this aggravating circumstance.
 

 B.
 

 The State also contends that the trial court erred when it did not find the existence of the aggravating circumstance set forth in § 13A-5-49(9), Ala.Code 1975. We agree. During the guilt phase of the trial, the jury found that the appellant committed the murders by one act or pursuant to one scheme or course of conduct. By virtue of that verdict, the jury found the existence of the aggravating circumstance set forth in § 13A-5-49(9), Ala. Code 1975. In fact, during its penalty phase instructions, the trial court specifically instructed the jury that, by virtue of its verdict finding the appellant guilty of committing the murders by one act or pursuant to one scheme or course of conduct, this aggravating circumstance was automatic. Therefore, the trial court should have found the existence of the aggravating circumstance set forth in § 13A-5-49(9), Ala. Code 1975.
 

 a
 

 Finally, the State argues that a remand is necessary because the trial court did not make specific written findings concerning the existence or nonexistence of the aggravating circumstance set forth in § 13A-5-49(10), Ala.Code 1975.
 

 “Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant’s participation in it.”
 

 § 13A-5-47(d), Ala.Code 1975. Because the trial court did not make findings concerning the existence or nonexistence of the aggravating circumstance set forth in § 13A-5-49(10), Ala.Code 1975, we agree.
 

 For these reasons, we remand this case with instructions that the trial court amend its sentencing order to comply with the requirements of § 13A-5-47(d), Ala. Code 1975, and to correct the above-referenced errors. If necessary, the trial court may reweigh the aggravating circumstances and the mitigating circumstances and resentence the appellant. On remand, the trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 42 days after the release of this opinion.
 

 REMANDED WITH INSTRUCTIONS.
 

 McMillan, j„ concurs; shaw and WELCH,
 
 *
 
 JJ„ CONCUR IN THE RESULT.
 

 
 *573
 

 On Return to Remand
 

 BASCHAB, Presiding Judge.
 

 On June 27, 2008, we remanded this case with instructions that the trial court amend its sentencing order to comply with the requirements of § 13A-5-47(d), Ala. Code 1975. On remand, the trial court complied with our instructions. We now address the propriety of the appellant’s convictions and sentence of death.
 

 Pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of the appellant’s convictions and sentence of death. The appellant was indicted for and convicted of three counts of capital murder — two counts because he committed the murders during the course of a robbery,
 
 see
 
 § 13A-5-40(a)(2), Ala.Code 1975, and one count because he committed the murders by one act or pursuant to one scheme or course of conduct,
 
 see
 
 § 13A-5-40(a)(10), Ala.Code 1975.
 

 The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor.
 
 See
 
 § 13A-5 — 53(b)(1), Ala.Code 1975.
 

 The trial court found that the aggravating circumstances outweighed the mitigating circumstances. It found that the State proved four aggravating circumstances — 1) the appellant committed the capital offenses while he was under a sentence of imprisonment,
 
 see
 
 § 13A-5-49(l), Ala. Code 1975; 2) the appellant committed the capital offenses while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, robbery, see § 13A-5-49(4), Ala.Code 1975; 3) the capital offenses were especially heinous, atrocious, or cruel compared to other capital offenses,
 
 see
 
 § 13A-5-49(8), Ala.Code 1975; and 4) the appellant intentionally caused the death of two or more people by one act or pursuant to one scheme or course of conduct,
 
 see
 
 § 13A-5-49(9), Ala. Code 1975. The trial court found that three statutory mitigating circumstance existed — 1) the appellant did not have a significant history of prior criminal activity,
 
 see
 
 § 13A-5-51(l), Ala.Code 1975; 2) the appellant committed the capital offenses while he was under the influence of extreme mental or emotional disturbance,
 
 see
 
 § 13A-5-51(2); and 3) the age of the appellant at the time of the offenses,
 
 see
 
 § 13A-5-51(7), Ala.Code 1975. It also appears to have made the following findings as to nonstatutory mitigating circumstances:
 

 “The defendant experienced a failed marriage nine to ten years before the murders. This marriage yielded two sons who, at the time of trial, were 15 and 14 years old, lived with their mother, and were described by the defendant’s sister as ‘good kids.’ Defense counsel suggested to the jury that by giving the defendant life without parole, perhaps he would have a positive influence on his two boys and could guide them away from life’s pitfalls that he had experienced.
 

 “The pre-sentence report notes and court files confirm that Mills was charged in 2001 for nonsupport of his two children. At the time of the murders, he was $10,318.67 in arrears on his child support payments. There is little, if any, basis for mitigation that the defendant would be any more supportive of his sons than he was been in the past. To argue that perhaps if he received life without the possibility of parole he could have any positive influence on his children is an extremely weak mitigator at best.
 

 “The defendant grew up in Haleyville, Alabama, in what his sister described as a ‘good home.’ After dropping out of high school in the eleventh grade, he
 
 *574
 
 worked as a truck driver and mechanic at various local establishments. His last employment was as a mechanic at High-tower’s .Amoco in Guin, Alabama, until he quit his job complaining of tendonitis shortly before the murders. Ben High-tower, the owner of the service station, rented a house to the Mills and described Jamie as ‘no trouble’ and ‘a hard worker.’ ”
 

 (C.R. 133.) The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced the appellant to death. The record supports its decision, and we agree with its findings.
 

 Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant’s sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
 

 As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether the appellant’s sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. The appellant committed two murders during two robberies and killed two people pursuant to one scheme or course of conduct. Similar crimes are being punished by death throughout this state.
 
 See Gaddy v. State,
 
 698 So.2d 1100 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.1997);
 
 Brooks v. State,
 
 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (Ala.1997);
 
 Bush v. State,
 
 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997);
 
 Taylor v. State,
 
 666 So.2d 36 (Ala.Crim.App.), opinion extended after remand, 666 So.2d 71 (Ala. Crim.App.1994), aff'd, 666 So.2d 73 (Ala. 1995);
 
 Holladay v. State,
 
 549 So.2d 122 (Ala.Crim.App.1988), aff'd, 549 So.2d 135 (Ala.1989);
 
 Siebert v. State,
 
 555 So.2d 772 (Ala.Crim.App.), aff'd, 555 So.2d 780 (Ala. 1989);
 
 Peoples v. State,
 
 510 So.2d 554 (Ala. Crim.App.1986), aff'd, 510 So.2d 574 (Ala. 1987). Therefore, we find that the sentence was neither disproportionate nor excessive.
 

 Finally, we have searched the entire record for any error that may have adversely affected the appellant’s substantial rights, and we have not found any.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 Accordingly, we affirm the appellant’s convictions and sentence of death.
 

 AFFIRMED.
 

 McMILLAN, SHAW, WISE, and WELCH, JJ., concur.